16046

STATE v. HARRIS.

(46 S. E. (2d) 682)

*Messrs. Julian B. Salley, Jr., Leonard A. Williamson* and *Dorcey Lybrand,* all of Aiken, for Appellant,

*Mr. B. D. Carter,* Solicitor, of Bamberg, for Respondent,

February 18, 1948.

STUKES, J.: Edward L. Bennett and his wife operated a country store and filling station near the city of Aiken, with upstairs quarters in which they and their small children lived. He was found on the morning of April 28, 1946, slumped behind his store counter mortally wounded, and his wife lay a few feet away near the entrance to the adjoining kitchen, with a bullet wound from which she died upon removal to a hospital. The witness who first arrived spoke to Bennett who was still alive, shot through the mouth and bleeding profusely. He requested that he be rushed to a hospital, saying that he was dying and with the remark, "a big Negro shot me and robbed me," he died. His little children were crying about him. The body was beside an open sack of potatoes and on the scale on the counter were some potatoes, and other articles lay there as if placed for a customer in the act of buying. No money was found on the person of the deceased and the open cash drawer was likewise empty.

Appellant was indicted and arraigned at the October, 1946, term of the Court of General Sessions for Aiken County, charged with the murder, by shooting, of Bennett. He was without counsel and the court appointed Messrs. Salley, Jr., Williamson and Lybrand, Attorneys of the Aiken Bar, to represent him. This they have done with commendable energy and skill. The trial was not had at that term of court and there was a special term in January, 1947, at which appellant was tried, convicted and sentenced to death. This appeal followed. Between the term of court at which appellant was indicted and that at which he was tried, he was impris-

oned at the State Penitentiary in Columbia, where his counsel were permitted to, and did, consult with him concerning his defense of not guilty, which plea was entered in his behalf. The exceptions raise the questions which will be discussed. Chief of them imputes error in the admission in evidence of the confession of the crime by appellant, first orally to the examining officers, and then in writing, signed by the appellant. All of the record relating to it has been carefully considered and will be reviewed.

The trial judge first heard testimony relevant to the admissibility of the confession in the absence of the jury, agreeable to motion of appellant's counsel. After hearing the testimony of the officers and of appellant, the latter elicited by the questions of his counsel and without cross-examination, the court concluded that insufficient evidence was adduced to render the confession incompetent for intimidation or inducement, by threat or offer of reward, in other words that it was free and voluntary within the rule.

The testimony of appellant anent the confession may be fairly summarized as follows: He was arrested in Nashville, Tenn., by local officers and there Sheriff Fallaw of Aiken County and State Constable Thompson took him from the jail and returned with him to Aiken by automobile in one day arriving there about 4 or 5 o'clock in the afternoon of Sunday, July 14, 1946, and placed him in jail. He was not questioned until the following Monday afternoon when he was taken by the sheriff and the jailor to the court house where he was told that the F.B.I. reported that he had killed the Bennetts with his pistol, which appellant denied. He was interviewed on that occasion for not over fifteen minutes. On Monday night at about seven or seven-thirty he was questioned by the officers, four in all including the jailor, at the jail, in the small office used for such interviews and for consultations between prisoners and their counsel. There were some six chairs and a desk and table in the room. This interview, he said, was a little over an hour, during which he

was accused of the homicide and upon his denial the officers insisted upon his guilt. It appears that the questions and answers related to appellant's movements on the day of the crime but nothing was done at that time to influence his answers. Tuesday afternoon this procedure was repeated, there being present three officers. Appellant's references to one Medlock caused the officers to send for him and appellant was meanwhile returned to his cell. Questioned as to whether there were actions by the officers which influenced his statements, appellant said that upon his repeated denials of guilty knowledge, Constable Thompson said that he was lying. Tuesday night he was questioned again by four officers for two or three hours, he said by one of the officers at his side and the others behind him and that Constable Thompson, with the back of his hand struck him on the side of his face at the time that he accused him of lying, but the witness later said that the blow was with the palm of the officer's hand, and sufficiently hard to have staggered him had he been standing. After this incident Thompson retired from the room and appellant said he was not afterward there much. Appellant also said that Officer Sprawls struck him on the same side of the face as did Thompson, this at the time Sprawls was at a typewriter typing a statement which appellant later signed. Afterward Wylie Bennett was brought in and discussed the case with appellant. All of this occurred on Tuesday night. On the next afternoon, Wednesday, he was questioned at the jail again and he said that one large officer had a blackjack shaking it at him. The jailor was absent. Appellant sat with his back to the wall and facing the officers. He said one of the officers made this threat: "I will tell you one thing, if you don't say you did kill those people, we will get a rope and rubber hose and you know what we will do." The reference was to State Officer Dollard, whom appellant did not know but identified in the court room. Appellant further quoted this officer as saying that when he got through with the rubber hose and rope he would get something from appellant that the latter did not know

he had; this in the presence of the sheriff and Chief State Officer Richardson and another officer. The officers whom appellant accused in testimony of having struck him at a previous interview were not present, but the officer who got out his blackjack before, had it again, swinging it, appellant said. This occasion lasted from an hour and a half to two hours and a half during which appellant persisted in his denial and after which he was taken back to his cell. Then Wednesday night he was interviewed again by the officers, beginning about eight o'clock, but he was questioned only by the sheriff, the other officers standing in the hall, and appellant testified there were no threats on this final occasion except that the sheriff told appellant that if he did not confess, his mother would be arrested or that a warrant would be issued therefor. Appellant then admitted his confession but testified that it was given because the officers would not believe his claims of innocence and that the sheriff dictated the written confession, which he merely repeated under the influence of fear of the former threats. On further questioning he was asked whether the threat of the arrest of his mother induced the confession and he replied in the negative.

The testimony of the officers relating to the confession was taken immediately before that of appellant, also in the absence of the jury, under questioning by the Solicitor and cross-examination by appellant's counsel. They were subjected to sequestration in the giving of their separate testimony. The agreed transcript of record recites that it was substantially the same as that of the officers later in the presence of the jury. From the transcript of the latter the following is taken:

First it may be said that all of the officers testified in such manner as to carry conviction that the confession was not the result of fear, intimidation, physical force or punishment or under the influence of any promise of immunity, leniency or other reward. The sheriff said appellant's confession was

made in the jail office or consultation room, small but sufficient to accommodate six or seven people in comfort, and there were several chairs in one of which appellant sat during all of the questioning. Appellant was placed in the Aiken jail on Sunday, July 14, 1946, and was not questioned until Monday afternoon when he was taken to the the court house for a few minutes for that purpose. Then on Tuesday afternoon he was again questioned for a short time; and similarly Tuesday night. However, the sheriff was not present on the last stated occasion. Besides the sheriff, except when he was absent, the questioning was by the Chief of the State Constabulary, Mr. Richardson, Aiken City Police Chief Sprawls, and State officers (or constables) Thompson and Long. They did not attend appellant together at one time, but were in and out during the questioning. Jailor Baker also occasionally took part. However, his "day off" was Wednesday and the sheriff took his place at the jail. The sheriff did not question appellant during the afternoon and was sitting at the jail desk at about 6:30 or 7:00 o'clock when Baker returned and the sheriff questioned appellant again. The sheriff's testimony at this point is quoted, as follows:

"Q. Now after these officers left, did you or not, late in the afternoon talk to him again? A. I didn't talk to him that afternoon. I just sat up on the desk and I locked him back up in the cell and came on out to the office and about 6:30 or 7:00, Mr. Baker came in and I went out there to talk to him again. No one was there but me and Mr. Baker and I told him I was going to swear out a warrant for his mother for transporting this stolen property and he said, 'don't get my mother mixed up in it and I will tell you the truth' and he wanted to talk to me by myself and Mr. Baker got up and went out. He said he didn't want to get his mother mixed up in it and I didn't promise him anything. I said, 'it looked like I would have to swear out a warrant for her' and he said he would tell me the truth and he said he left home about nine o'clock that Sunday morning, walking to Aiken and

came to the trolley line bed from Renney Park and turned left over to the Vaucluse Road and came up to the filling station and when he got to the filling station he went in and had a funny feeling like he never had in his life before and he bought a pack of cigarettes, some bacon and balony and a couple of cans of meat and a package of snuff and then he decided he wanted some Irish potatoes and then he said Mr. Bennett put a few in the scales and as he went down to pick up some more and as he straightened up, Harris said he shot Mr. Bennett three times and he heard a lady hollering and he turned to shoot her and she ran and he shot her one time. Said he jumped over the counter and got his pocket book and I said, 'which pocket' and he said, 'the left one' and he said he got the change out of the drawer and went into the woods and followed the woods all the way to that steep hill and turned down the road by the cemetery and went on to Buggers to a little restaurant and bought a couple of sandwiches and two drinks and he left there and went to Virginia's house and on the way to Virginia's house, he counted the money and it was either $152 or $162, and said he got eight or ten dollars in change."

Immediately upon this confession the sheriff called the police station and summoned State Officers (Chief) Richardson and Thompson; the former came immediately and the latter a few minutes later. The prisoner repeated the entire statement in the presence of the sheriff and Chief Richardson; Thompson arrived in time to hear some of it. None could use a typewriter, so City Chief Sprawls was summoned to type the statement, which he did as the words came from the prisoner, and after it was written it was read over to him and he signed it, without, all of the officers testified, any threat or promise. The prisoner said the shooting was done with the 38 calibre, hammerless pistol which Williams had and which the officers recovered from Williams and introduced in evidence. It was about midnight when the writing of the confession and the signing of it were completed. Ap-

pellant was then taken to the State Penitentiary in Columbia for safekeeping. The written confession upon which the conviction was obtained is here reproduced:

"State of South Carolina,

County of Aiken.

Personally comes L. D. Harris who says that on Sunday Morning April 28th, 1946, I left home about nine o'clock. I was on my way to Aiken walking from Graniteville to Aiken. I came up the trolley bed line from Raney Park and then cut across to the Vaucaluse Road. As I was walking up the road I got in site of the store xxx I did not know whose store it was *I had some sort of funny feeling that I had never had before.* I went on in the store. I asked for a pack of Camel Cigarettes and then I asked for some meat, Baloney meat and fat back. When I asked for the baloney he came from behind the counter and went to the ice box and he got the meat out and went back behind the counter. I asked for some other things but I can't remember anything except Irish Potatoes. He put the potatoes up on the scales *and as he was weighing them up he* xxxxxx he *leaned down to get more and as he straightened up I fired three times at him.* I do not know exactly where they hit him. His wife xxxxxx started into the store *and turned around* and I fired at her. I then jumped over the counter behind which Mr. Bennett was laying with his head turned up against the wall. I reached in *left hand hip pocket* and pulled out his bill fold. *I reached into the* money draw *after I had pulled it nearly out* and got the change out of the draw. I went on out from behind the counter and walked on out the front door. Went on straight on across in front of the store and on into the woods. Went on toward Kalmia Hill, I went a long way down that road and *then climbed up a steep bank* and *then turned* and *went down cemetery road to Graniteville.* I went *to a shop in front of Day's store,* near Fox Crossing. I went on in the shop and *bought a couple of sandwiches* and a couple of drinks. I left

this shop and went to Virginia Matthews house and *on my way to the house* I counted the money. I had either *$152.00 or $162.00* I do not remember which. *The largest bill was a ten. There were eight or nine of them.* The rest was in ones and fives and the rest was in change. When I got Virginia's house I sat down in the swing and talked. About ten·or fifteen minutes later Medlock, J. T., he come along. I then walked to his house with him. He took a bath and changed clothes and shined his shoes. We then came on back to my house. I eat dinner. We walked back up to the corner and we talked to some girls. We then left there and went on to Buggers. We then went and bought some whiskey. J. T. and I bought one pint together. We drank the whiskey and went on up to Wyley Bennetts. We rode over to dug Davis house. Wyley Bennett, J. T. and I were together. We bought another half pint of whiskey there. He went sixty five and I paid sixty. We left there and went back to Adam Newsom. I saw Henry Butler and asked him where he was going. He said that he was going there too. We went on and put J. T. out at his house. Wyley then carried me home and put me out. It was now getting late in the afternoon. I went to work Monday. I spent money and had a good time buying whiskey and beer. Monday night. I worked Tuesday. I was with Bronson Gary McBonnett and Lucille Johnson. We picked up two girls and a boy. We bought a lot of liquor and beer in Aiken, and we went out to the trash pile and Bronson shot the pistol once and left one ball in it. This is the pistol that I used in the Bennett killing. My xxxxx xxxxxx this pistol to Johnson for Charley Williams to keep for me.

L. D. Harris   Seal

Witness   G. R. Richardson

Witness ' W. Price Fallaw

State of South Carolina

County of Aiken

Personally appeared before me W. P. Fallaw and made oath that he saw the within named L. D. Harris sign and seal the within instrument, and that he with G. R. Richardson witnessed the execution thereof.

Sworn and subscribed to before
me this 17th day of July 1946.

G. R. Richardson (L.S.)

J. M. Sprawls

Notary Public for S. C."

On Tuesday night when the sheriff was not at the jail to take part in the questioning of appellant the latter made a statement which was typed by officer Sprawls and signed by appellant which implicated Wylie Bennett in the commission of the crime. It recited that appellant took from Annie Brown's house the 38 S & W pistol about three weeks before and had given it to Bennett who was to buy more cartridges for it; that on the day of the homicide appellant went to this Bennett's home about noon and found him dejected and on inquiry Bennett said that he had gotten into trouble with the gun and had shot a man and a woman; he cautioned appellant not to be caught with the gun. Wylie Bennett was at this time serving a sentence on the Aiken County chaingang for a minor crime, and one of the officers went and brought him to confront appellant in the jail. He denied appellant's statement incriminating him, which, however, appellant insisted at that time was true. This prolonged the period of questioning until about midnight.

Chief Richardson of the State Constabulary testified that he first saw appellant on Wednesday and participated in the questioning of appellant for probably less than an hour. The prisoner denied killing the Bennetts but did not then accuse Wylie Bennett as he had on the night before until he was

faced by Wylie Bennett and his denial. Thereafter Richardson was called back to the jail by the sheriff at about 9:00 or 9:30 o'clock in the evening and found only the sheriff and the appellant in the jail office where both were sitting. Appellant proceeded to make the confession which has been quoted, without threat, intimidation or promise of reward. Meanwhile officer Thompson, who had also been called by the sheriff, arrived and heard the confession. After it was reduced to writing by officer Sprawls, summoned for the purpose, Chief Richardson was present when Sprawls read it over to appellant. This was near 11:00 P. M. Thereupon Chief Richardson and his officer Dollard left to take the appellant to the State penitentiary.

State Officer Thompson testified that he had taken part in the investigation from the beginning and accompanied the sheriff to Nashville to bring appellant back on a warrant for larceny of the pistol. He alone questioned appellant on the automobile trip to Aiken and he admitted obtaining a 38 pistol from Annie Brown for which he.said he exchanged a 32 Colt and that his mother had taken the Brown pistol for delivery to Charlie Williams. On that information this officer recovered the 38 pistol from Charlie Williams' home, which was that in evidence. This witness participated in the questioning of appellant in the jail office on Tuesday night and was told by appellant that if the other officers would absent themselves he would tell the witness the whole thing. Then appellant for the first time implicated Wylie Bennett and Thompson called the jailor, another State officer and City Police Chief Sprawls, the latter to type appellant's statement. When this was in progress Thompson went to the chaingang and brought Wylie Bennett to the jail, which took some time. Thereupon appellant accused Wylie Bennett of the crime and charged him with having admitted it, which was denied by Wylie. Thereupon the witness, Officer Thompson, got up and slapped appellant on the shoulder and said, "you are not telling the truth." Thompson had

little to do with the questioning Wednesday, being, as he said, "in and out," until he was summoned to the jail by Chief Richardson that night to hear the confession, the Chief stating upon his entrance, in the presence of appellant, that appellant had decided to tell the truth. Thompson had been a State officer since 1935 and during the eleven years' experience had been investigating crimes. He was designated by Chief Richardson to devote his whole time to the Bennett homicide until it was solved. In the course of his investigation he was informed that Annie Brown had complained that someone had stolen her pistol and he visited Annie Brown, who told him she suspected appellant of the theft which included seven cartridges. She had three left which, upon examination, he found to be of 38 calibre, the same as those which were extracted from Bennett's body. This was reported to the sheriff and after some further investigation the latter procured the warrant for appellant which charged him with larceny of the pistol. The warrant was mailed to the authorities in Nashville, where the officers learned appellant went shortly after the crime, and he was arrested there. Notice came to Aiken late on Friday afternoon, July 12th, and the trip was made next day to return appellant to Aiken.

The foregoing is an impartial summary of appellant's testimony and that of the officers which related to the circumstances of the confession and the means pursued to procure it. The officers were subjected to extended cross-examination by appellant's counsel but no new facts were elicited and they did not contradict themselves or each other although they were subjected to the test of sequestration. They were all long-experienced in law enforcement and criminal investigation. Their testimony indicates no animosity toward appellant or excess of zeal in the performance of their duties. Of course, Officer Thompson should not have slapped appellant, however lightly, on the shoulder or on the side of the face, as appellant claimed in his testimony. But this occurred on the day before the confession was made, after

which Thompson admittedly asked no more questions and had little to do with the case. It would be unreasonable to conclude that the incident induced the confession; certainly it was insufficient to remove the issue of the voluntary nature of the confession from the province of the jury where it ordinarily belongs in such cases of conflicting evidence.

Appellant's counsel moved upon the following grounds to exclude the confession:

"A. That the alleged confession was not freely and voluntarily given, but on the contrary, as a matter of law, is not a confession which the law will recognize as such in that it was extorted by the use of physical force, violence, fear, threats, intimidation, duress and under such circumstances as to preclude any possibility that it was free and voluntary.

"B. That to admit this alleged confession in evidence under the circumstances disclosed by the evidence would constitute a deprivation of the rights of the Defendant as guaranteed by the 14th Amendment of the Constitution of the United States of America and the right to a fair and impartial trial as guaranteed by the Constitution of the State of South Carolina."

The trial judge heard the motion in the absence of the jury and concluded that the confession was admissible; but he later fully instructed the jury that they should finally decide, in the light of all of the evidence, whether the confession was in fact freely made and voluntary, and that they should exclude it from their consideration if they found that it was not and, in effect, acquit the appellant. The pertinent portion of the charge to the jury was as follows:

"Now, gentlemen, there has been introduced in the evidence here for your consideration an alleged confession, purportedly made by the defendant. That alleged confession, gentlemen, is repudiated by this defendant. In other words, today in Court he denies that confession, or alleged confession. That presents, gentlemen, an issue of fact for your de-

termination, under all of the facts and circumstances in this case.

"Now in passing upon that issue of fact, gentlemen, this is the rule that you would apply. The question is whether the alleged statement was made freely and voluntarily, and, unless it was free and voluntary, you are to disregard it and pay no attention to it. It is for you, the jury, to say if the defendant made a confession and, if so, whether it was made under duress or in fear. If it was, you are to disregard it; otherwise, if it was made freely and voluntarily you would give it such weight as it has on your mind.

"In other words, gentlemen, it is an issue of fact for you to determine from all of the facts and surroundings connected with the alleged confession. It is for you to say, gentlemen, if the alleged confession was made freely and voluntarily; it is for you to say, gentlemen, as to whether any coercion, duress, fear or intimidation entered into the securing of that alleged confession. Should you conclude, gentlemen, from your view of these facts and circumstances surrounding the obtaining of the alleged confession that it was not obtained freely and voluntarily, or should you conclude, gentlemen, that there was any intimidation and I will say 'any intimidation', duress, coercion, exerted by the officers in obtaining the alleged confession, you are to disregard it, gentlemen, and it goes out of the case. In that connection, I will also instruct you gentlemen, that should you conclude from your view of the facts and circumstances surrounding this alleged confession—should you conclude, gentlemen, that it was not obtained freely and voluntarily from this defendant, it would not only go out of the case, gentlemen, but it would be your duty and I so instruct you to find a verdict of 'not guilty' for this defendant, because, gentlemen, should you conclude that that alleged confession was not freely and voluntarily obtained from this defendant, it, as I have instructed you, would go out of the case which would, gentlemen, take from the State's case any testimony sufficient for my pre-

senting the issue of his guilt to you. In other words, gentlemen, should that confession under your view of the facts and circumstances surrounding the obtaining of it go out of the case, there is not sufficient testimony with it out to render a verdict of guilty against this defendant.

"Of course, gentlemen, should you conclude on the other hand the alleged confession was freely and voluntarily obtained it would remain in the case as part of the evidence of the case to be considered along with all of the other facts and circumstances in the case in passing upon the guilt or innocence of this defendant."

This was a faithful following of the established rule ▌ in this State with respect to repudiated pre-trial confessions. Our last, and rather full, authority on the subject is *State v. Miller,* 1947, 211 S. C. 306, 45 S. E. (2d) 23, 26, where the general rule is restated from the older cases which are cited, as follows: "A confession is not admissible unless it is voluntary, and the question whether it is voluntary (when raised by conflicts in the evidence-interpolated) must be determined, in the first instance, by the presiding judge, but the jury must be the final arbiters of such fact." That this is in accord with the weight of authority elsewhere is demonstrated in the annotations in 18 L. R. A., N. S., 777, 50 L. R. A., N. S., 1078, 85 A. L. R. 870, and 170 A. L. R. 567. Our modern decisions are digested in 85 A. L. R. at pages 895, 896 and 170 A. L. R. at page 595. However, the rule is an old one in this jurisdiction. *State v. Kirby,* 1847, 1 Strob. 378. The opinion in the case just cited was quoted with approval in *State v. Branham,* 1879, 13 S. C. 389, to the effect that a confession is admissible though it is elicited by questions, whether put to the prisoner by a magistrate, officer or private person; and the form of the question is immaterial to its admissibility, though it assumes the prisoner's guilt. We conclude that there was no error in the admission under the instructions in this case.

Appellant has invoked the protection of the Fourteenth Amendment of the Federal Constitution and asserts that "due process" was denied him by admission in evidence of his oral and written confessions of guilt in view of his version in testimony of the circumstances of the making of them. He relies upon *Chambers v. Florida,* 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; *Ward v. Texas,* 316 U. S. 547, 62 S. Ct. 1139, 86 L. Ed. 1663; *Anderson v. United States,* 318 U. S. 350, 63 S. Ct. 599, 87 L. Ed. 829; *McNabb v. United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819; *Ashcraft v. Tennessee,* 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192; and *Malinski v. New York,* 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029.

The cited cases have been carefully examined and considered but none controls, for differences in their facts. They involved instances of fear of mob violence, wholesale arrests without warrants, all-night questioning by relays of officers, proven physical mistreatment, transporting from county to county for questioning, and even torture. The defendants in some of these and similar cases were ignorant and illiterate youths, unlike appellant who is an apparently intelligent young adult. None of the vitiating influences which have been mentioned was present here. Giving the cited decisions the full weight of their unquestioned authority, they are of no aid to the appellant.

Incidentally, the *Anderson* and *McNabb cases, supra,* are not at all in point for they were reviews of criminal convictions in lower Federal courts and turned mainly upon the violation of a Federal statute by the investigating officers. The case in hand presents features of similarity with that of *Lyons v. Oklahoma,* 322 U. S. 596, 64 S. Ct. 1208, 1212, 88 L. Ed. 1481, and appears to come within the rule of it, stated in the opinion as follows: "But where there is a dispute as to whether the acts which are charged to be coercive actually occurred, or where different inferences may fairly be drawn from admitted facts, the trial judge and the jury are

not only in a better position to appraise the truth or falsity of the defendant's assertions from the demeanor of the witnesses but the legal duty is upon them to make the decision. *Lisenba v. California, supra,* 314 U. S. [219], at page 238, 62 S. Ct. [280] at page 290, 86 L. Ed. 166."

There is an exception to the court's instructions to the ■ jury for failure to expressly include that if the confession was induced by promise of reward, it was invalid. This position is untenable for the simple reason that there was no evidence of promise of reward so there could have been no inducement of that nature. Appellant in his very full testimony claimed only threats, intimidation and duress. Cited is *State v. Scott,* 209 S. C. 61, 38 S. E. (2d) 902, where judgment of conviction was reversed because the instructions included the element of hope of reward but omitted fear and duress. There as here, the evidence of appellant related only to intimidation, duress and physical violence; so the applicable element was there erroneously omitted from the instructions; but not so here. Counsel were not dissatisfied at the time for toward the end of the instructions the court considerately asked appellant's counsel if there were omissions and they suggested none.

It will be noted that certain words of the confession ■ are emphasized in the copy above. This denotes the underscoring of these words at some time during the trial. On the point the record on appeal contains the following stipulation: "It is agreed that the pencil underlinings appearing on this exhibit were made by the Solicitor, but neither he nor counsel for defense can recall at what stage of the case or trial they were made. It is also agreed that all exhibits were delivered to the jury upon retiring to consider the case."

In the oral argument of the appeal the Solicitor said that he might have done the underscoring (which was with pencil) for the purpose of his argument of the facts to the

jury, or possibly for the purpose of his examination of some of the witnesses, but he could not recall when or for what purpose it was done. Of course, any material alteration of any exhibit introduced in the trial of the case is improper and conceivably could be prejudicial to one party or the other. Granting, however, that the underscoring was done during the course of the trial and existed when the jury took the written confession into their room, along with other exhibits, for the purpose of their deliberation, we cannot think of any manner in which it would be prejudicial to appellant. The most of the underscored words appear to be rather unimportant in the document, the underlining added nothing, and counsel have pointed out no reason or ground for prejudice on this account and have cited no supporting authority. No error is found.

There was other, independent evidence tending to prove appellant guilty, which need not be recounted, such as his presence in the neighborhood of the crime at the time, his possession of the 38 calibre pistol introduced in evidence and his subsequent exchange of it with a friend for another of smaller calibre, his unceremonious leaving of his regular employment and departure from the State within a few days after the homicide, etc. However, it may be added that these circumstances, corroborative though they were of the confession, were probably insufficient in themselves to support the verdict, which was the view of the trial court. Thus the conviction depended upon the confession, and therefore upon its admissibility in evidence which has, accordingly, been considered with utmost care.

The written confession, which has been set out in full, contains details which carry conviction of truth; they could not have been within the knowledge of the investigating officers and they are marks of full disclosure by appellant; there could have been no point in his or their fabricating these otherwise ·unimportant details. The confession was rather poorly composed and roughly written but it is easily com-

prehended that the jury, ordinarily the exclusive fact finders, concluded that it contained the truth.

Chief of Aiken City Police Sprawls testified that he assisted the County and State officers in their investigation of the crime as the result of which appellant was placed in jail. He was trained in ballistics and fingerprinting. The 38 calibre bullets extracted from the body of the slain man were sent to the F.B.I. laboratory in Washington, as was the pistol; but no report of that agency was introduced. The witness said that rust in a pistol barrel will, if enough, make impossible the identification of a bullet as one fired from that pistol. He testified that he tried to secure fingerprints from the cash drawer in the Bennett store, but because it was made of rough lumber no prints were available; and similar failure was met in efforts to obtain prints from other articles in the store.

During the lengthy cross-examination of Chief State Officer Richardson the trial was interrupted by a most unusual incident. The official stenographer inserted in the record his notation that there was a remark by a spectator which he did not hear, hence it does not appear at that point in the record. Counsel who was conducting the cross-examination stated to the court his objection to "a statement made like that by a spectator in the presence of the jury." The Judge turned to the jury and inquired whether any of them heard the remark. Several replied that they had heard a part of it. Thereupon the Judge directed the sheriff to take the spectator who made the at least partly audible remark and place him in jail, which was done. Thereupon the jury were sent to their room and the examining counsel was asked what he heard, which was only the epithet, but he asked that other spectators be questioned as to what they heard. The offending spectator was sitting at the time of his remark in one of the jury seats opposite and across the court room from those occupied by the trial jury. The court had the nearest other spectator sworn for examination, which the

Judge himself conducted. It turned out that this witness was a newspaper reporter who said that he happened to look in the direction of the jailed spectator, who appeared to address his remark to State Officer Long, sitting behind him, and said, "They shouldn't try a son-of-a-bitch like that." The court then examined Officer Long who identified the offending spectator as one Floyd who lived near Wagener in Aiken County and was a former State Highway Patrolman; his version of the remark was slightly different but to the same effect as that quoted above.

Appellant's counsel then made a motion for a mistrial upon the ground of the spectator's statement, whether the jurors heard the remark in its entirety or not, which counsel contended deprived the appellant of due process of law. The court ruled as follows, quoting from the record: "Gentlemen, I don't think that I would be warranted in granting the motion. That is a hazard that any trial is subjected to. Of course, as to the Court dealing with the individual is a matter aside from this case. The only thing I can do is what I am going to do, as I understand and conceive it my duty to do and that is to fully instruct that jury, as I am going to do when I bring them back, in reference to that and I asked that jury three times as to what they did hear and they said only the latter part. Some of them said nothing and some said 'the latter part' which was 'a son-of-a-bitch like that' according to the statement. Now of course, as we see it, the outburst of a spectator or bystander is no part of the trial and is not evidence in the case. As I say, that is a hazard that can come up in any trial and I don't believe I would be justified, gentlemen, in declaring a mistrial, on what you heard, Mr. Salley, and as taking the statement as you heard it and as the jury says they heard it, as you say that could have referred to the Court or attorneys or anybody else, as far as that goes. Even taking it at its face value, as heard by Mr. Martin or Mr. Long, who was sitting closer to him than anyone else, I don't think I could be justified even if I concluded that the

jury heard all of it. He has no official connection with the case. He is nothing more than any other spectator sitting in the Court room and because some spectator conducts himself in a manner that might be prejudicial, unless I should allow such to continue, I don't believe that I would be justified in granting a mistrial."

Following the foregoing the Judge forthwith plainly instructed the jury when recalled that the remark by the spectator was no part of the trial and that they were under obligation not to permit it to influence their verdict, which should be founded only on the evidence admitted. This was a proper disposition of the unusual occurrence. It did not warrant withdrawal of the case, in view of the prompt incarceration of the offending spectator and the careful instruction of the jury thereabout. There was wise exercise of judicial discretion.

The subject of the conduct of spectators at trials is treated in 53 Am. Jur. 55 et seq., Trial, Secs. 42 and 43; and our case of *State v. Gens*, 107 S. C. 448, 93 S. E. 139, L.R.A. 1918E, 957, is the subject of an annotation in L. R. A. 1918E, 959. Other annotations are found in 12 L.R.A., N. S., 98, 12 Ann. Cas. 645 and 121 Am. St. Rep. 514. The authorities are uniform that the conduct of a trial is largely within the sound discretion of the presiding judge and only clear abuse of it to the prejudice of appellant will warrant reversal.

No appeal can be more important than this, which involves capital punishment; and the record has accordingly been closely scrutinized for legal, prejudicial error, which has not been found; and that is the limit of the jurisdiction of this court in such cases. The judge who presided over the trial is recognized as a very able one and no sane jury could have honestly rendered any other verdict than guilty, in view of the confessions.

The exceptions are overruled and the judgment affirmed.

BAKER, C. J., and FISHBURNE, J., concur.

TAYLOR and OXNER, JJ., dissent.

OXNER, Justice (dissenting). After a careful review of this record, I am inclined to think that the only reasonable inference to be drawn from the undisputed facts is that the alleged confession was not freely and voluntarily made. Under my view there is little, if any, other evidence connecting the defendant with this horrible crime. Under these circumstances, I think the grave doubt that exists in my mind as to the admissibility of this confession should, *in favorem vitae,* be resolved in favor of the defendant. I, therefore, dissent.

TAYLOR, J., concurs.