21581

The STATE, Respondent, v. Sylvester Lewis ADAMS, Appellant.

(283 S. E. (2d) 582)

116

*David I. Bruck* and *Chief Atty. John L. Sweeny* of *S. C. Office of Appellate Defense,* Columbia, *for appellant.*

*Atty. Gen Daniel R. McLeod* and *Asst. Attys. Gen. Kay G. Crowe* and *Lindy P. Funkhouser,* Columbia, and *Sol. William L. Ferguson,* York, *for respondent.*

October 6, 1981.

HARWELL, Justice:

Sylvester Lewis Adams was found guilty of housebreaking and of the kidnapping and murder of Brian Chambers in the first phase of a bifurcated capital trial. He was sentenced to death upon recommendation of the jury at the conclusion of the second phase. We reverse the convictions, vacate the death penalty and remand for a new trial.

The appellant asserts that the trial judge erred during ■ the guilt or innocence phase of the trial by refusing to permit his trial counsel to inspect notes which one of the State's police witnesses was actually referring to during his testimony. His testimony concerned, primarily, the chain of custody of the physical evidence introduced at trial. We agree that the refusal to permit appellant's trial counsel an opportunity to examine these notes for purposes of cross-examination constitutes reversible error.

In *State v. Tyner,* 273 S. C. 646, 258 S. E. (2d) 559, 565 (1979) we stated:

"Where a document is used by a witness to refresh his recollection, the adverse party has a right to have the memorandum available to him for cross-examination."

See also, McCormick on Evidence, Section 9, P. 17 ((2d) Ed. 1972). We recently applied and extended the principle as stated in Tyner to allow opposing counsel the opportunity to examine notes a witness uses to refresh his memory with prior to trial. *State v. Hamilton,* S. C. 276 S. E. (2d) 784 (1981).

Counsel should have been allowed to inspect any of the notes that the witness actually referred to.

Appellant Adams chose to take the witness stand dur- ■ ing the guilt or innocence phase of the bifurcated trial thus subjecting himself to cross-examination. During this cross-examination the following colloquy took place:

"Q. You've read this [confession] haven't you?

"A. I've read it I don't know how many times.

"Q. And wasn't that the most cruel, brutal thing that anybody could do to anybody?

"A. I did not do that to him.

"Q. I'm asking you, what's in this statement—

"A. I did not do that.

"Q. I'm asking you, you read the statement didn't you?

"A. Right.

"Q. Is that one of the most cruel and brutal things that you can even think of?

"A. Repeat that again now?

"Q. The contents of this statement, whoever did this, is one of the most cruel and brutal things that has ever happened, whoever did it,

"A. None of those words on there is mine. It's those detectives'.

"Q. I didn't say they were your's. I'm asking you another question. Isn't this one of the worst, cruel things that anybody could do to a little boy? Isn't it?

"A. Yeah.

"Q. And that person doesn't deserve to leave [sic], does he, that did that to him.

"A. Those words was made up, I don't know if that's the truth or not, but the words made up on the statement, I really can't say.

"Q. Anybody that would do something like this ought to die, shouldn't they?

"A. I really can't say if that's the truth. The words were made up on the statement.

"Q. I'm not saying that. I'm asking you if this actually happened, whoever did it should die, shouldn't they?

"A. Yeah, whoever done it.

"Q. That's all."

Although no timely objection was raised at trial, in a capital case this Court will review the record *in favorem vitae*. Thus we agree with appellant's argument on appeal that the solicitor's questions were highly improper and constitute prejudicial error.

Our law on capital trials provides for a bifurcated proceeding. Section 16-3-20, Code of Laws of South Carolina (1976). At issue in the first trial is whether the defendant is innocent or guilty of murder. At issue in the second trial is whether the defendant deserves to live or die.

When a defendant waives his privilege against self-incrimination by electing to take the witness stand in the first phase of the trial, he opens himself to impeachment only as to issues related to his innocence or guilt. Given the structure of the capital proceeding, the defendant who testifies

in the first phase may nonetheless choose to exercise his privilege at the second phase and not testify. Thus, to delve into the punishment area while cross-examining a defendant during the guilt-or-innocence phase of the trial is a violation of his constitutional guarantee against coerced self-incrimination.

Beyond the serious Fifth Amendment violation, the questions propounded here were not only irrelevant as to the issue then before the jury, they also were designed to create a response, based on opinion, going to an ultimate issue reserved for the jury's determination. The effect of having the appellant unwittingly state that he deserved the death sentence prior to the jury having even considered the matter created an "arbitrary factor" intolerable to this Court. Section 16-3-25(C) of the Code.

At the conclusion of the presentation of the evidence and of arguments by counsel at the first phase of the trial, the trial judge undertook to declare the law to the jury, but during the course of his instructions he somehow charged the 1974 death penalty act. The 1974 legislation which provided for mandatory death sentences had been declared unconstitutional by this Court and repealed by the legislature prior to this trial. See our decision in *State v. Rumsey*, 267 S. C. 236, 226 S. E. (2d) 894 (1976), based on decisions of the United States Supreme Court in *Woodson v. North Carolina*, 428 U. S. 280, 96 S. Ct. 2978, 49 L. Ed. (2d) 944 (1976) and *Roberts v. Louisiana*, 428 U. S. 325, 96 S. Ct. 3001, 49 L. Ed. (2d) 974 (1976). Although the proper capital punishment law was subsequently charged at the second phase of the trial, the trial judge never cured his error at the first phase. The appellant argues that the improper charge was a reversible error. We agree.

This matter does not merit lengthy discussion. Article V, Section 17 of the South Carolina Constitution mandates that the judge shall declare the law to the jury. It would seem axiomatic that the law declared must be the current and correct law. A full curative instruction should have *immediately* been given to this jury. To simply super impose the 1977 Act over the unconstitutional 1974 Act served only to foster confusion and prejudice.

At trial appellant Adams' confession became an issue. In order to establish its voluntariness, the State introduced the testimony of the police officers who heard and transcribed it as well as the testimony of an attorney.

Thomas McKinney was originally appointed to represent the appellant. At the time of his appointment, McKinney testified that he found Adams in a state of willingness to render a confession but that he advised against this. The police officers also asserted that Adams was quite determined to give a confession. McKinney stated that he had lengthy discussions with Adams about the confession matter and went line by line over it with Adams to assure its veracity.

Subsequent to McKinney's initial representation but prior to the trial, Adams expressed his disatisfaction with McKinney and advanced an assertion that his confession had been coerced. McKinney later petitioned the court to be relieved as counsel for Adams. This petition was granted.

During the course of the trial below, the State used McKinney to describe the circumstances of the taking of the confession. The trial judge advised that confidential matters could not be disclosed and, in fact, only conversations held in the presence of law enforcement officers were directly disclosed on the stand. However, McKinney did describe one private conversation as follows:

". . . I wanted to discuss the matter privately with him because I wanted to look him over for a period of time. I wanted to talk to him about the seriousness of what was about to take place and what had taken place and what was happening. That is what we did."

Then later in McKinney's direct testimony, the following colloquy took place:

"Q. Now Mr. McKinney, from your experience and your observation of this defendant and what went on at this time, October 23rd, 1979, is it your opinion that this statement was given freely?

"A. Yes, sir, it is.

"Q. Voluntary?

"A. Yes, sir."

The appellant alleges that his attorney-client privilege was violated by this discourse since the opinion of his former attorney was apparently based in part on observations made during confidential conversations. We agree.

We recently discussed the attorney-client privilege in *State v. Doster,* Opinion No. 21399, filed 3/4/81, stating that:

"The privilege is based upon a public policy that the best interest of society is served by promoting a relationship between the attorney and the client whereby utmost confidence in the continuing secrecy of all confidential disclosures made by the client within the relationship is maintained."

We believe that the spirit of this policy dictates that not only is the conversation protected but the entire setting of the confidential conference must be protected as well. To lend privilege to the words spoken but to allow disclosure of professional impressions drawn from the manner of their delivery all but destroys the substance of the privilege.

The State argues that the appellant had waived his attorney-client privilege by repudiating the voluntariness of his confession and disputing the propriety of McKinney's representation prior to trial.

These circumstances do not support the allegation of waiver. When McKinney was called by the State to testify, the defense, of course, had not been presented. Therefore, the State clearly delved into the attorney-client relationship *in this trial* before Adams himself made any disclosures.

Section 16-3-910 provides that:

■ "Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by a parent thereof, shall be guilty of a felony and, upon conviction, shall suffer the punishment of life imprisonment *unless sentenced for murder as provided in* § 16-3-20."

(Emphasis added)

The trial judge below sentenced Adams to death for his murder conviction upon the jury's recommendation and also sentenced

him to life imprisonment for his kidnapping conviction. The appellant asserts that the life sentence runs afoul of the clear intent of Section 16-3-910. We agree.

Since appellant has been sentenced for murder as provided in Section 16-3-20, he cannot be given the otherwise mandatory life sentence for kidnapping inasmuch as no statutory provision is made for concurrent punishment under this circumstance.

The appellant also asserts that the trial judge improperly instructed the jury during the first phase of the trial on the law relating to voluntariness of confessions.

We caution the court on remand to impress upon the jury that no confession may be considered by it unless found beyond reasonable doubt to have been given freely and voluntarily under the totality of the circumstances. *State v. Harris,* 212 S. C. 124, 46 S. E. (2d) 682 (1948), rev'd on other grounds, 338 U. S. 68, 69 S. Ct. 1354, 93 L. Ed. 1915 (1949). In addition, since the appellant was in custody at the time of his alleged confession, the jury must be convinced that he received and understood his Fifth and Sixth Amendment rights, as mandated by *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. (2d) 694 (1966). See *State v. Pendergrass,* 270 S. C. 1, 239 S. E. (2d) 750 (1977); *State v. Doby,* 273 S. C. 704, 258 S. E. (2d) 896 (1979), cert. denied 444 U. S. 1048, 100 S. Ct. 739, 62 L. Ed. (2d) 735 (1980).

Appellant's contention that the jury was "more conviction prone" and "unrepresentative" are patently without merit. The former allegation is based on speculation; the latter ignores the fact that exclusions from the jury panel are based on responses to inquiries at voir dire, not on membership in an identifiable classification.

At the sentencing phase of the bifurcated trial the trial judge submitted two statutory mitigating circumstances to the jury for its consideration. See, Section 16-3-20(C), Code of Laws of South Carolina (1976). Among the two factors submitted was, "The defendant has no significant history of prior criminal conviction involving the use of violence against another person." Section 16-3-20(C) (b) (1). The appellant asserts that

no evidence of prior violence was established and that, as a consequence, the trial judge erred by failing to delete the word "significant" from this mitigating circumstance prior to its submission to the jury. We disagree.

It is entirely appropriate to submit the mitigating circumstance as statutorily set forth. Whether the circumstance is or is not established and what weight shall be accorded the circumstance if found are matters addressed to the jury's deliberations. *State v. Linder*, S. C., 278 S. E. (2d) 335 (1981).

The sentencing portion of Section 16-3-20 at subsection (C) provides in part:

"Where a sentence of death is not recommended by the jury, the court shall sentence the defendant to life imprisonment. In the event that all members of the jury after a reasonable deliberation cannot agree on a recommendation as to whether or not the death sentence should be imposed on a defendant found guilty of murder, the trial judge shall dismiss such jury and shall sentence the defendant to life imprisonment. The jury shall not recommend the death penalty if the vote for such penalty is not unanimous."

The appellant argues that the trial judge erred by failing to instruct the jury initially that if they failed to agree to the verdict, then the court would be required to sentence him to life imprisonment. This omission allegedly coerces the individual jurors into capitulating to an arbitrary verdict recommendation. We disagree.

The language of the statute provides that where a sentence of death is not recommended by the jury, a life sentence must be given. The situation implicitly envisioned here is that normally the jury will unanimously either recommend life or death. The undecided jury is the exception. That portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury.

The appellant was indicted, tried and convicted for housebreaking as well as murder and kidnapping. The indictment for housebreaking alleged that he, "did in

York County on or about the 17th day of October, 1979, break and enter the house, to wit: 1073 Henderson St., Rock Hill, S. C. with intent to commit a crime therein." Adams urges that the indictment was fatally defective since it fails to allege the particular crime intended. We disagree.

We have dealt with the issue of indictment sufficiency in several recent cases. *State v. Crenshaw,* 274 S. C. 475, 266 S. E. (2d) 61 (1980); *State v. Hiott,* S. C., 276 S. E. (2d) 163 (1981); *State v. Shoemaker,* S. C., 275 S. E. (2d) 375 (1981); *State v. Sweat,* S. C. 279 S. E. (2d) 375 (1981). In *State v. Crenshaw, supra,* we held that:

"An indictment is adequate if the offense is stated with sufficient certainty and particularity to enable the court to know what judgment to pronounce, the defendant to know what he is called upon to answer, and acquittal or conviction to be placed in bar to any subsequent conviction." 266 S. E. (2d) 61 at 62.

We have also stated in *State v. Ham,* 259 S. C. 118, 191 S. E. (2d) 13, 17 (1972) that:

"[T]he true test of the sufficiency of an indictment is not whether it could have been more definite and certain, but whether it contains the necessary elements of the offense intended to be charged and sufficiently appraises the defendant of what he must be prepared to meet."

The indictment sufficiency tests noted above must be viewed with a practical eye; all the surrounding circumstances must be weighed before an accurate determination of whether a defendant was or was not prejudiced can be reached. *State v. Hiott, supra; State v. Shoemaker, supra; State v. Evans,* 216 S. C. 328, 57 S. E. (2d) 756 (1950).

In this case the statement signed by Adams itself described his *mens rea.* He was indicted for the crimes accompanying the housebreaking-kidnapping and murder. In addition, he was accorded a preliminary hearing. Under all the circumstances, the contention that the indictment failed to fulfill its purposes is not supported. There is no indication that the appellant was

unfairly prejudiced since he obviously knew the crimes for which he was being tried.

Appellant's remaining exceptions need not be treated here since they are unnecessary to the disposition of this appeal and on retrial may not become issues. We therefore do not address these matters.

Reversed and remanded for a new bifurcated trial.

LITTLEJOHN, NESS and GREGORY, JJ., concur.

LEWIS, C. J., concurs in result.

LEWIS, Chief Justice (concurring):

I concur in the result of the majority opinion, but disagree with the holding as to the sufficiency of the indictment for housebreaking, for the reasons set forth in my dissent in *State v. Brooks*, S. C., . . . S. E. (2d) . . ., filed October 5, 1981.