JUSTICE FEW:
This is a post-conviction relief (PCR) action arising out of Louis Michael Winkler, Jr.’s murder conviction and death sentence. We reverse the PCR court’s ruling that trial counsel was ineffective in the sentencing phase of Winkler’s trial for not objecting when the trial court did not answer the jury’s questions about the consequences of a failure to reach a unanimous verdict. We also reverse the PCR court’s denial of Winkler’s pretrial motions in the PCR action in which he requested additional time to obtain and analyze evidence related to his alleged brain damage. Because the denial of additional time deprived Winkler of the opportunity to adequately develop his PCR claim that trial counsel was ineffective for failing to investigate brain damage, we vacate the PCR court’s ruling denying that claim. We remand to the PCR court for further proceedings.
I. Procedural History
On the evening of the murder, Winkler kicked in the door to his estranged wife’s home, knocked her son to the ground, and shot her in the face, killing her instantly. In addition to murder, Winkler was convicted of first-degree burglary and assault and battery of a high and aggravated nature. We described the specific facts of the crimes in our opinion affirming the convictions and death sentence on direct appeal. State v. Winkler, 388 S.C. 574, 579-82, 698 S.E.2d 596, 599- *647 600 (2010), cert. denied, 563 U.S. 963, 131 S.Ct. 2155, 179 L.Ed.2d 940 (2011).
After Winkler filed an application for PCR, the PCR court entered a scheduling order that it later amended to set a specific trial date. Winkler twice moved to amend the scheduling order so PCR counsel could have more time to obtain and analyze MRI and PET scans of his brain to investigate the possibility of brain damage. On the first motion, the PCR court extended the deadline for filing an amended application, but refused to extend any other deadlines, including the trial date. The PCR court denied the second motion.
At the close of Winkler’s presentation of evidence at the PCR trial, the court granted the State a directed verdict on Winkler’s claim that his trial counsel—Ralph Wilson and Paul Rathbun—were ineffective in failing to investigate and present evidence of Winkler’s brain damage. In its final order, the court found Winkler “did not present any evidence that he suffered from neurological and cognitive impairments or dysfunction.”
However, the court granted Winkler PCR on the ground that trial counsel were ineffective in the sentencing phase of the criminal trial when they did not object to the trial court’s refusal to answer the jury’s questions as to what would happen if the jury could not reach a unanimous verdict on Winkler’s sentence. Instead of ordering a new sentencing proceeding, the PCR court “sentenced” Winkler to life in prison.
In the sentencing phase, after deliberating for more than six and a half hours, the jury sent a note to the trial court asking, “Could you please explain what happens if we’re not able to reach a unanimous decision?” The trial court, the State, and Winkler’s trial counsel agreed the note was not a communication the jury was deadlocked. The trial court sent a written response to the jury’s note stating, “I cannot answer the question the way you phrased it. Please let me know if you have any other questions.” Trial counsel did not object.
After the jury deliberated for approximately two more hours, the trial court sent another written note to the jury asking, “do you have any questions or messages for the court?” The jury replied “[W]hat [does] the law state when a *648 jury does not reach any unanimous decision at this stage of the trial?” The trial court then sent a note to the jury stating, “I cannot answer hypothetical questions. Do you have any specific questions to ask or comments that you would like to make about your jury?” Trial counsel did not object.
Sometime later, the jury sent a note indicating it was having difficulty reaching a verdict. The trial court then decided to give the jury a version of an Allen[1] charge. At 12:26 a.m., the trial court gave the jury a modified Allen charge. In the charge, it informed the jury two times “the decision of the jury must be unanimous.” After giving the charge, the trial court allowed the jury to choose whether to continue deliberating that night or come back the next day. The jury chose to return the next morning.
The following morning, before the jury resumed deliberations, the trial court told the jury to let it know if the jury needed to re-hear the Allen charge. One juror requested to rehear the charge. Wilson initially objected, arguing it was inappropriate to give the charge again. After a discussion with the solicitor and the trial court, however, Wilson withdrew his objection. The trial court then re-read the modified Allen charge. Less than an hour later, the jury returned a verdict recommending the death penalty.
After the PCR court granted Winkler PCR, the State and Winkler each filed a petition for a writ of certiorari. We granted certiorari on three questions: (1) whether the PCR court erred “in finding trial counsel were ineffective in failing to object when the trial judge declined to answer the jury’s questions regarding the consequences of a failure to reach a unanimous verdict in a capital murder sentencing proceeding in light of the trial judge’s instruction to the jury that a recommendation of either death or life imprisonment must be unanimous;” (2) whether the PCR court “abuse[d its] discretion in denying [Winkler’s] motion to alter the PCR scheduling order and therefore err[ed] in finding [Winkler] failed to carry his burden of proving trial counsel were ineffective in failing to investigate mitigating evidence of brain damage;” and (8) whether “the PCR court err[ed] in failing to remand for a new *649 sentencing proceeding.” We denied certiorari on all other issues, including the State’s argument the PCR court erred in finding trial counsel was ineffective for not objecting to the Allen charge.
II. Allen Charge
Before we reach the merits of the questions as to which we granted the writ of certiorari, we address Winkler’s argument we should dismiss the writ because of an issue as to which we denied certiorari. Winkler argues the PCR court granted relief on the independent basis that trial counsel was ineffective for not objecting to an unconstitutionally coercive Allen charge and that ruling renders his PCR final, regardless of the outcome of this appeal. See Dawson v. State, 352 S.C. 15, 20, 572 S.E.2d 445, 447 (2002) (stating an Allen charge cannot be unconstitutionally coercive, “but must instead be even-handed, directing both the majority and the minority to consider the other’s views”). Thus, Winkler argues, we do not need to consider the question of whether trial counsel was ineffective for not objecting to the trial court’s decision not to answer the jury’s questions.
The PCR court’s final order is confusing on this point. The issue is further confused by the fact the State petitioned for certiorari claiming “the PCR court erred in finding trial counsel was ineffective for not objecting to the Allen charge.” However, we find the PCR court did not rule trial counsel was ineffective for not objecting to the Allen charge. Rather, the PCR court granted Winkler relief based only on trial counsel’s decision not to object to the trial court not answering the jury’s questions regarding a failure to reach a unanimous verdict. In doing so, the PCR court relied in part on its conclusion that the modified Allen charge contained an incorrect statement of law because the charge stated the decision of the jury must be unanimous. Because the PCR court did not grant Winkler relief on the independent ground that trial counsel was ineffective in not objecting to the modified Allen charge, we deny Winkler’s request that we dismiss the writ of certiorari, and we proceed to address the merits of the questions on which we granted certiorari.
*650 III. The Failure to Reach a Verdict Issue
We consider claims for ineffective assistance of counsel under the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To obtain PCR under the Strickland test, the applicant must show “(1) counsel’s representation fell below an objective standard of reasonableness and (2) but for counsel’s error, there is a reasonable probability that the outcome of the proceeding would have been different.” Williams v. State, 863 S.C. 341, 343, 611 S.E.2d 232, 233 (2005) (citing Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693).
Winkler contends his counsel’s performance fell below an objective standard of reasonableness because they should have objected to the trial court’s decision not to answer the jury’s questions. Winkler bases his argument initially on South Carolina Code subsection 16-3-20(C) (2015), which provides,
If members of the jury after a reasonable deliberation cannot agree on a recommendation as to whether or not the death sentence should be imposed on a defendant found guilty of murder, the trial judge shall dismiss such jury and shall sentence the defendant to life imprisonment as provided in subsection (A).
Winkler argues that when the jury asked what would happen if it did not reach a unanimous sentencing verdict, the trial court was required under subsection 16-3-20(0, due process,[2] and the Eighth Amendment[3] to inform the jury the defendant would be sentenced to life in prison, which “means until the death of the defendant without the possibility of parole.” S.C. Code Ann. § 16-3-20(A) (2015). When the trial court refused to inform the jury of this, Winkler argues, his trial counsel should have objected.
*651 The PCR court agreed. The court concluded “the jury is entitled to an instruction that the defendant’s sentence becomes a matter of law to be imposed by the court if they cannot reach a unanimous verdict.” Based on that conclusion, the PCR court found trial counsel was unreasonable in not objecting to the trial court’s refusal to answer the jury’s questions, and thus counsel’s performance was deficient and Winkler satisfied the first prong of Strickland. We disagree.
At the PCR trial, Winkler’s PCR counsel gave trial counsel Ralph Wilson a chance to explain why he didn’t object. Wilson testified “my understanding is ... if a jury asks a question about what happens if they’re deadlocked then the Judge can’t then tell them ... that this defendant is going to get a life sentence.” As we will explain, trial counsel’s understanding was consistent with applicable precedent. In fact, we can find no South Carolina or federal precedent on which Winkler’s trial counsel could have relied to support making an objection. The PCR court’s conclusion, on the other hand, had no support in South Carolina or federal precedent. Thus, we find the PCR court’s conclusion was an error of law, and the error controlled its finding as to trial counsel’s performance. See Jordan v. State, 406 S.C. 443, 448, 752 S.E.2d 538, 540 (2013) (stating we “will reverse the decision of the PCR court when it is controlled by an error of law”); Edwards v. State, 392 S.C. 449, 455, 710 S.E.2d 60, 64 (2011) (“The appellate court will reverse the PCR court only where there is either no probative evidence to support the decision or the decision was controlled by an error of law.”). Because no applicable precedent supported making an objection, we find trial counsel’s decision not to object was reasonable. See Harden v. State, 360 S.C. 405, 408, 602 S.E.2d 48, 49 (2004) (stating trial counsel was not deficient in not objecting when there was “no statutory law or judicial precedent in this State” on which to base an objection).
In State v. Adams, 277 S.C. 115, 283 S.E.2d 582 (1981),[4] the appellant argued “the trial judge erred by failing to instruct the jury initially that if they failed to agree to the verdict, then the court would be required to sentence him to life imprison *652 ment.” 277 S.C. at 124, 283 S.E.2d at 587. We found no error, and held—referring to subsection 16-3-20(C)[5]—“[t]hat portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury.” Id.
In State v. Copeland, 278 S.C. 572, 300 S.E.2d 63 (1982), we again addressed the question of whether the trial court “erred in denying [the defendant’s] request to instruct the jury of the actual effect of failure to reach a unanimous agreement as to punishment.” 278 S.C. at 584, 300 S.E.2d at 70. The appellant in Copeland also claimed—like here—the trial court erred “in instructing the jury that unanimity is required before a life sentence can be imposed.” Id. Quoting Adams, we affirmed the trial court’s refusal to charge the substance of subsection 16-3-20(C) and its instruction that the “verdict or recommendation” must be unanimous. Id. We held, “The trial judge correctly stated the applicable law.” Id.
Trial counsel’s understanding was also consistent with federal precedent. In Evans v. Thompson, 881 F.2d 117 (4th Cir. 1989), the Fourth Circuit reviewed the denial of a habeas corpus petition that arose out of the petitioner’s death sentence in Virginia. 881 F.2d at 119. Similar to the situation here, the jury “inquir[ed] of whether a life sentence must be unanimous,” and the petitioner argued “the trial judge improperly failed to instruct the jury that under Virginia law a split decision by a capital sentencing jury automatically becomes life.” 881 F.2d at 123. Also similar to this case, the petitioner argued “he was denied his due process rights because the trial judge improperly instructed the jury that a sentence of life imprisonment could be imposed only by a unanimous verdict.” Id. Alleging a due process violation, the petitioner made the same argument upon which Winkler now claims his trial counsel should have objected, and the Fourth Circuit found the argument “without merit.” Id. The court held, “No obligation exists for the trial judge to inform the jury of the ultimate result should they fail to reach a verdict.” *653 Id. (citing Barfield v. Harris, 540 F.Supp. 451, 472 (E.D.N.C. 1982), aff'd, 719 F.2d 58 (4th Cir. 1983)).
In Jones v. United States, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the Supreme Court of the United States addressed the question “whether petitioner was entitled to an instruction as to the effect of jury deadlock” in the penalty phase of his federal capital trial. 527 U.S. at 375, 119 S.Ct. at 2096, 144 L.Ed.2d at 378. The Supreme Court held “the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree.” 527 U.S. at 381, 119 S.Ct. at 2098, 144 L.Ed.2d at 382. The Court also found applicable federal statutes do not require the instruction, and declined to exercise its “supervisory powers” to require the instruction. 527 U.S. at 381, 383, 119 S.Ct. at 2098, 2099,144 L.Ed.2d at 382, 383.
The first prong of the Strickland test requires a court to assess counsel’s performance against an objective standard of reasonableness. Edwards, 392 S.C. at 456, 710 S.E.2d at 64. One of the key circumstances a court must consider in its examination of counsel’s decision not to make a particular objection is whether there was any law to support the objection. In Harden, the issue before this Court was whether plea counsel’s performance was deficient when he did not object on the grounds of double jeopardy to the petitioner being convicted of drug trafficking based on conspiracy and drug distribution. 360 S.C. at 408, 602 S.E.2d at 49. We upheld counsel’s performance because we found “no statutory law or judicial precedent in this State ... holds a conviction for both conspiracy and the substantive offense relating to the conspiracy ... constitutes double jeopardy.” Id. Because the law did not support the double jeopardy objection, we found counsel acted reasonably in not making it. Id. We stated, “An attorney is not required to anticipate potential changes in the law which are not in existence at the time of the conviction.” Id.; see also Thornes v. State, 310 S.C. 306, 309-10, 426 S.E.2d 764, 765 (1993) (stating, “This Court has never required an attorney to anticipate or discover changes in the law,” and citing cases to illustrate the point).
The situation here is comparable to Harden. At the time of Winkler’s trial, South Carolina law applicable to whether the *654 trial court should charge the jury the consequences of the jury’s failure to reach a verdict was limited to subsection 16-3-20(C) as interpreted in Adams and Copeland. Neither opinion provides any support for trial counsel making an objection, nor for the PCR court’s finding that the jury is “entitled” to the charge. In fact, we read Adams and Copeland to suggest the court should not have answered the jury’s question. We stated in Adams that subsection 16-3-20(0) “is addressed to the trial judge only and need not be divulged to the jury,” 277 S.C. at 124, 283 S.E.2d at 587, and we quoted that statement in Copeland, 278 S.C. at 584, 300 S.E.2d at 70-71.
Federal precedent also provided no support for an objection. In Evans—a situation almost identical to this one—the Fourth Circuit found “no obligation” to inform the jury of the consequences of not reaching a verdict, 881 F.2d at 123, and Jones leaves no argument that federal law would have supported an objection, 527 U.S. at 381, 383, 119 S.Ct, at 2098, 2099, 144 L.Ed.2d at 382, 383. All of those cases—Adams, Copeland, Evans, and Jones—were decided before Winkler’s 2008 trial. The law, therefore, did not support trial counsel making an objection to the trial court’s decision not to answer the jury’s question.
Winkler relies heavily on the fact that Adams, Copeland, and Jones dealt only with the trial court’s initial jury charge, but in this case the jury specifically asked what would happen if it could not reach a verdict. Winkler argues that when a jury “makes explicit” a question it has about the law, the trial court must answer the question “even where the jury is initially given proper instructions.” We agree this case is different because in those cases the jury did not ask the question this jury asked. For three reasons, however, that difference does not change our decision. First, while this case might be distinguishable from Adams, Copeland, and Jones on the basis Winkler argues, it cannot be distinguished from Evans—in which the jury also “inquired] of whether a life sentence must be unanimous.” 881 F.2d at 123. We do not know the precise question asked by the jury in Evans. However, the argument the petitioner made as to how the question should have been answered is the same argument Winkler makes here. Id. In that almost identical factual scenario, the court held, “No *655 obligation exists for the trial judge to inform the jury of the ultimate result should they fail to reach a verdict.” Id.
Second, the significance of the difference between this case and Adams, Copeland, and Jones is limited by the fact that this is a PCR case. The issue in this PCR is not whether a trial court must answer the jury’s question when trial counsel specifically requests it, but whether trial counsel should have objected to the trial court not giving an answer, Specifically, the issue before us is whether Winkler’s trial counsel’s decision not to make an objection was reasonable under the first prong of Strickland. Adams and Copeland are important to the resolution of this issue not because they are controlling'— they are not—but because they were the only South Carolina precedent available to trial counsel when counsel made the decision not to object, and neither case provided any support for an objection. Similarly, Jones is not squarely on point with this case, but it does not support making an objection to the trial court’s refusal to answer this jury’s questions.
Third, Winkler’s argument that a trial court must accurately explain a point of law when a jury asks a specific question about it depends on whether the answer to the question is applicable to the jury’s deliberations. Even if a jury asks a specific question about a point of law, when the point is not applicable to the jury’s deliberations, the trial court should not answer the question. See generally State v. Weaver, 265 S.C. 130, 137, 217 S.E.2d 81, 34 (1975) (“There was no duty of the trial judge to instruct the jury as requested by the appellant because such charge was not applicable to any issue in the case.”). Therefore, the mere fact the jury asked the specific question did not require the trial court to answer it. Rather, whether the trial court should have answered the question depended on whether the point of law about which the jury asked was applicable to the jury’s deliberations.
Winkler argues that Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), demonstrates the answer to the jury’s questions was applicable to the jury’s deliberations. In Simmons, the Supreme Court of the United States held the petitioner’s due process rights were violated when the State made his future dangerousness a factual issue and the trial court refused to answer the jury’s question as to *656 petitioner’s parole eligibility. 512 U.S. at 156, 114 S.Ct. at 2190, 129 L.Ed.2d at 138; see also State v. Starnes, 340 S.C. 312, 326, 531 S.E.2d 907, 915 (2000) (“Due process is violated when the State ‘raises[s] the specter of [the defendant’s] future dangerousness generally, but then thwart[s] all efforts by [the defendant] to demonstrate that ... he never would be released on parole and thus ... would not pose a future danger to society.’ ” (alteration in original) (quoting Simmons, 512 U.S. at 165, 114 S.Ct. at 2194, 129 L.Ed.2d at 143)). Due process required the jury’s question to be answered in Simmons because the jury needed to know the law related to petitioner’s parole eligibility to properly deliberate over the factual question of future dangerousness. See, e.g., 512 U.S. at 165, 114 S.Ct. at 2194-95, 129 L.Ed.2d at 144 (explaining that without an answer to the jury’s question, “[t]he jury was left to speculate about petitioner’s parole eligibility when evaluating petitioner’s future dangerousness”). In Simmons, therefore, the answer to the jury’s question was directly applicable to the jury’s deliberations.
Here, on the other hand, we see little possibility that answering the jury’s question could assist the jury in deliberations. A juror’s knowledge that if the jury does not reach a verdict the court will impose a sentence of life in prison will not help the juror understand the evidence, or assist the jury in reaching a verdict. Rather, we are concerned that informing the jury what the sentence will be if they do not reach a verdict creates a risk that some juror’s attention may be diverted away from the duty to deliberate, and perhaps even alert a juror that he or she can control the sentence by refusing to deliberate.
The Supreme Court of the United States addressed this concern in Jones. The petitioner requested the jury be charged, “In the event ... the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release.” 527 U.S. at 379, 119 S.Ct. at 2097-98, 144 L.Ed.2d at 381. Addressing the Eighth Amendment argument that the jury could be “misled regarding its role in the sentencing process” by the trial court’s refusal to give the instruction, 527 U.S. at 381-82, 119 S.Ct. at 2099, 144 L.Ed.2d at 382 (quoting Romano, 512 U.S. *657 at 9, 114 S.Ct. at 2010, 129 L.Ed,2d at 11), the Court explained:
The truth of the matter is that the proposed instruction has no bearing on the jury’s role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. ... We have never suggested ... that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process. On the contrary, we have long been of the view that “[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.” We further have recognized that in a capital sentencing proceeding, the Government has “a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.” We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest.
527 U.S. at 382, 119 S.Ct. at 2099, 144 L.Ed.2d at 382-83 (footnotes omitted) (first quoting Allen, 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 531; and then quoting Lowenfield v. Phelps, 484 U.S. 231, 238, 108 S.Ct. 546, 551, 98 L.Ed.2d 568, 578 (1988)); see also State v. McCarver, 341 N.C. 364, 462 S.E.2d 25, 42 (1995) (stating “to inform the jury that its failure to agree on determinative issues will result in a sentence of life imprisonment would be an open invitation to the jury—or a single juror—to avoid its responsibility to fully deliberate and to force a recommendation of life by the simple expedient of disagreeing”).
Winkler’s reliance on Simmons is misplaced because in that case the answer to the jury’s question was necessary to enable the jury to understand and fully deliberate one of the key factual issues in the case. In this case, the consequence of not reaching a verdict was not applicable to the jury’s deliberations, and informing the jury of that consequence could have created a risk of undermining the deliberations.
Winkler also argues the decision not to object was unreasonable in light of the trial court’s instruction on two occasions *658 during the modified Allen charge “the decision of the jury-must be unanimous.”[6] The trial court’s instruction was correct in this respect, however, because a verdict must, under law, be unanimous.[7] See S.C. Const, art. V, § 22 (“All jurors in any trial court must agree to a verdict in order to render the same.”); see also Copeland, 278 S.C. at 584, 300 S,E.2d at 70 (holding the trial court “correctly stated the applicable law” when it charged the jury in the sentencing phase of a capital trial “your verdict or recommendation ... must be unanimous on each count, that is, your verdict or recommendation must be the verdict or recommendation of all twelve of you”). Because a verdict must be unanimous, the jury may not recommend life unless it reaches a unanimous verdict. The fact that subsection 16-3-20(C) requires the trial court to impose a life sentence if the jury is not unanimous does not change the correctness of the statement “the decision of the jury must be unanimous.” We find trial counsel’s decision not to object to the trial court’s refusal to answer the jury’s questions is not rendered unreasonable by the trial court’s instruction “the decision of the jury must be unanimous” because the trial court’s charge in this respect was a correct statement of South Carolina law.
As we have explained, there was no legal support on which trial counsel could have relied to make an objection when the trial court refused to instruct the jury as to the consequences of not reaching a verdict in the sentencing phase of Winkler’s trial. Therefore, the PCR court’s finding that the jury was “entitled” to the instruction was an error of law that controlled its decision to grant PCR. See Jordan, 406 S.C. at 448, 752 *659 S.E.2d at 540; Edwards, 392 S.C. at 455, 710 S.E.2d at 64. We reverse the PCR court’s ruling.
We are not prepared to hold that no situation will ever arise in which it is appropriate for the trial court to consider answering such a question. If that situation does arise, however, the trial court should be careful to keep the jury focused on its duty to deliberate and not empower one juror to control the sentence by refusing to participate in deliberations. See Jones, 527 U.S. at 382, 119 S.Ct. at 2099, 144 L.Ed.2d at 382-83.
IV. The Brain Damage Issue
Winkler contends the PCR court abused its discretion when the court refused to grant his PCR counsel additional time in which to obtain and analyze MRI and PET scans of his brain. Without this evidence, Winkler argues, “the PCR court’s decision denying relief on this claim was not the product of a full and fair hearing.” We agree the PCR court abused its discretion in not granting Winkler additional time.
A. Relevant Facts
Winkler filed his initial application for PCR on May 2, 2011 with the assistance of the appellate defender who represented him on direct appeal. On June 24, 2011, as required by subsection 17-27-160(B) of the South Carolina Code (2014), the PCR court appointed new counsel—Emily Paavola and John R. Mills—who had not previously represented Winkler. Wink-ler’s initial application did not include a claim for ineffective assistance of counsel for failing to properly investigate brain damage.
Subsection 17-27-160(C) of the South Carolina Code (2014) provides, “Not later than thirty days after the filing of the state’s return, the judge shall convene a status conference to schedule a hearing on the merits of the application for post-conviction relief.” In compliance with this requirement, the PCR court held a status conference on July 7, 2011. Subsection 17-27-160(C) also requires the PCR trial “must be scheduled within one hundred eighty days from the date of the status conference, unless good cause is shown to justify a continuance.” At the July 7 status conference, the PCR court *660 entered a scheduling order setting several deadlines, including (1) December 1, 2011 for filing an initial amended PCR application; (2) May 1, 2012 for filing a final amended PCR application; and (3) June 1, 2012 for completing discovery. The July 7 order also provided the PCR trial would be held on or before July 1, 2012. On September 21, 2011, the court amended the scheduling order to set the PCR trial for June 18, 2012.[8]
According to Winkler’s brief in this appeal, “[ajpproximately two months into their investigation, counsel noted potential indicators of brain damage, ... [and] asked the PCR court to grant funding for consultation with a neuropsychologist.”[9] The PCR court granted the funding request on September 9, 2011. September 9 order stated, “Present counsel’s preliminary investigation has uncovered potential neuropsychological impairments, and the record suggests that trial counsel failed to obtain the services of a neuropsychologist.” PCR counsel promptly retained a neuropsychologist, who on November 2 recommended to counsel they “consider consulting with a neurologist or neuropsychiatrist” for further information about Winkler’s brain damage. The neuropsychologist also informed counsel “it would be very helpful to have neuroimaging.” On November 3, counsel requested funding to obtain the neuroim-aging—MRI and PET scans of Winkler’s brain—and to analyze the images. The PCR court entered an order on November 21 finding, “The record reflects that a neuropsychologist has recommended such imaging, and that it may uncover neurologic impairment or dysfunction that trial counsel failed to discover.” The PCR court found the request “appropriate,” the neuroimaging and analysis “reasonable and necessary,” and ordered funding.
On November 30, Winkler filed a motion to extend the deadlines in the scheduling order by ninety days. In the motion, counsel represented to the PCR court that they had “begun the process of having these tests ordered by the local *661 expert, but they were “advised that it will take approximately 4 to 6 weeks before the initial testing can be completed, and approximately 6 weeks after that before additional analysis can be conducted by the out-of-state expert.” Thus, PCR counsel could not obtain the test results and determine whether they supported amending Winkler’s PCR application for at least ten weeks, or approximately mid-February'—long after the December 1 deadline for the initial amendment. On December 8, the PCR court amended the scheduling order to extend the deadline for filing an initial amended PCR application to February 2, 2012 and a final amended application by May 1, 2012. The PCR court denied counsel’s request to extend the discovery deadline and the PCR trial date.
On January 26, 2012, Winkler was sent to the Medical University of South Carolina (MUSC) for the MRI and PET scans. Winkler obtained the MRI scan, but he was unable to have a PET scan because his blood glucose level was 272 mg/dl—almost three times the normal level. On February 7, a physician from MUSC wrote a letter to PCR counsel explaining, “If the patient has an abnormal blood glucose concentration, then the imaging will not produce a reliable result” and “Mr. Winkler’s glucose concentration strongly suggests that he has untreated diabetes.”
On February 14, PCR counsel wrote the Department of Corrections to confirm a phone conversation from the week before. In the letter, counsel informed the Department of Corrections Winkler’s testing indicated he likely had untreated diabetes and counsel requested “Mr. Winkler receive testing and treatment for his blood sugar ... as soon as possible.” On April 4, the physician from MUSC wrote PCR counsel: “Based on my review of Mr. Winkler’s medical summary ..., it appears that Mr. Winkler has finally begun treatment for his diabetes. However, his blood sugar appears to remain far enough outside of the normal range that we cannot perform an accurate study.” The physician predicted it would take “six to eight weeks of attentive treatment for glucose concentration to return to the normal range.” On April 5, the physician who was to analyze the scans wrote to counsel and indicated “Conducting the analyses normally takes approximately six to eight weeks from the time the images are received.”
*662 On April 10, 2012, Winkler filed a second motion to extend the deadlines in the scheduling order. He asked specifically for “a continuance of 180 days to file his final amended PCR application, and adjustments to the other scheduled dates accordingly.” In the motion, counsel represented, “Despite efforts to diligently investigate this case, for unforeseen circumstances beyond their control, counsel are not in a position to formulate, in good faith, all claims for post-conviction relief by the May 1st deadline.” The PCR court denied the motion “without oral arguments or responsive brief.”
B. Preservation
The State argues this issue is not properly before the Court because Winkler did not petition for certiorari from the PCR court’s ruling denying the motions to extend the deadlines in the scheduling order. Instead, Winkler raised the issue in his return to the State’s petition. We find the issue is properly before us because the issue was presented to the PCR court, ruled on by the PCR court, presented to this Court, and the State responded. See Herron v. Century BMW, 395 S.C. 461, 465, 719 S.E.2d 640, 642 (2011) (stating issue preservation rules are “meant to enable the lower court to rule properly after it has considered all relevant facts, laws, and arguments” (quoting I’On, L.L.C. v, Mt. Pleasant, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000))); In re Michael H., 360 S.C. 540, 546, 602 S.E.2d 729, 732 (2004) (“In order to preserve an issue for appeal, it must be raised to and ruled upon by the trial court. In other words, the trial court must be given an opportunity to resolve the issue before it is presented to the appellate court.” (citing Wilder Corp. v. Wilke, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998))).
C. Abuse of Discretion
We applaud the PCR court in its effort to comply with section 17-27-160’s goal of expediting PCR trials in death penalty cases. See S.C. Code Ann, § 17-27-160(E) (2014) (referring to “expedited capital post-conviction relief hearings” (emphasis added)). However, subsection 17-27-160(0 provides the PCR court should grant additional time if “good cause is shown to justify a continuance.” When Winkler’s PCR counsel filed the second motion to extend the deadlines in the schedul *663 ing order, the PCR court found Winkler had “ample opportunity to investigate matters pertaining to the applicant’s ‘potential brain damage’ and ‘mental health disorder.’ ” We disagree with that finding.
PCR counsel was appointed on June 24, 2011 with no prior familiarity with the case. The trial transcript alone is 2955 pages. Within two months of their appointment, counsel discovered “potential indicators of brain damage” and evidence that trial counsel did not investigate it. Counsel promptly sought funding for a neuropsychologist, who in turn recommended neuroimaging. Counsel promptly sought funding for the neuroimaging. When counsel discovered it could take three months to get the results of the neuroimaging, they promptly filed a motion seeking more time. Winkler’s doctors then discovered he had a previously undiagnosed medical condition that would prevent accurate results from the neuroimaging. Counsel promptly attempted to get Winkler the medical treatment he needed to enable reliable neuroimaging. From our review of these exchanges between PCR counsel and Wink-ler’s doctors, counsel acted efficiently in attempting to obtain the neuroimaging the PCR court had previously ruled was necessary. Nevertheless, in early April 2012—two months before the scheduled trial date—Winkler’s doctors informed PCR counsel it would take three to four months to obtain the results of the neuroimaging. Under these circumstances, we find no evidence to support a finding that PCR counsel had “ample opportunity” to develop the case related to brain damage. Rather, based on the detailed documentation of their investigation on the brain damage issue, we find it would have been impossible for PCR counsel to obtain PET scans in time to have an expert review them and be prepared to testify at the PCR trial. Therefore, “good cause [was] shown to justify a continuance.” § 17-27-160(C).
We find the PCR court abused its discretion in denying Winkler’s second motion for additional time. This ruling left PCR counsel in a position from which they could not present evidence to support the claim that trial counsel was ineffective for failing to investigate Winkler’s brain damage. We find, therefore, the PCR court’s ruling on the brain damage claim should be vacated.
*664 V. Conclusion
We granted certiorari on three questions. As to the first question, we REVERSE the PCR court’s ruling that Wink-ler’s trial counsel was ineffective for not objecting to the trial court’s decision not to answer the jury’s questions about the result of not reaching a unanimous verdict. As to the second question, we REVERSE the PCR court’s denial of Winkler’s second motion for additional time in which to obtain and analyze MRI and PET scans of his brain. Based on our ruling, the PCR court’s subsequent denial of PCR as to trial counsel’s alleged failure to investigate and present evidence of his brain damage was also in error and is VACATED. Because of our ruling on the first question, we need not reach the third question—the propriety of the PCR court’s attempt to sentence Winkler to life in prison instead of remanding to the court of general sessions for a new sentencing proceeding.
We REMAND to the PCR court for further proceedings.
KITTREDGE, J., concurs. HEARN, J., concurring in a separate opinion. PLEICONES, C.J., concurring in part and dissenting in part in a separate opinion in which BEATTY, J., concurs.

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed, 528 (1896).

. See U.S. Const, amend. XIV, § 1 ("No state shall ... deprive any person of life ... without due process of law; ....”); S.C. Const, art. I, § 3 (“nor shall any person be deprived of life ... without due process of law”).

. See U.S. Const, amend. VIII ("nor cruel and unusual punishments inflicted”); Romano v. Oklahoma, 512 U.S. 1, 8-10, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1, 10-11 (1994) (summarizing prior case law to recognize the Eighth Amendment prevents misleading the jury regarding its role in the sentencing process).

. Overruled on other grounds by State v. Torrence, 305 S.C. 45, 406 S.E.2d 315 (1991).

. The language of the applicable sentence in subsection 16-3-20(C) has been amended slightly since we decided Adams. See Act No. 83, 1995 S.C. Acts 560-61 (enacting the current language for the sentence). The sentence as it read in 1981 is quoted in Adams, 277 S.C. at 124, 283 S.E.2d at 587.

. On several other occasions during the modified Allen charge, the trial court encouraged the jury to reach a unanimous verdict, or otherwise used the word unanimous. Only twice, however, did the trial judge instruct the jury its verdict "must” be unanimous.

. We do not intend in making this statement to comment on the propriety of including such an instruction in an Allen charge. See Tucker v. Catoe, 346 S.C. 483, 493, 552 S.E.2d 712, 717 (2001) (analyzing the circumstance that the "jury was told of the importance of a unanimous verdict” as a relevant factor in the analysis of whether an Allen charge was coercive). As we explained in section II of this opinion, whether the Allen charge here was coercive is not currently before us. We simply observe that the instruction “the decision of the jury must be unanimous” is a correct statement of law.

. The July 7 and September 21 orders are in not the Appendix, While we have no doubt that good cause existed for extending the trial date beyond the 180 day provision in subsection 17-27-160(C), it does not appear that either order contained a specific finding of good cause.

. The appendix does not reflect the precise date of the funding request.