# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Jerome Jenkins Jr., Appellant.

Appellate Case No. 2019-001280

————————

Appeal from Horry County
Robert E. Hood, Circuit Court Judge

————————

Opinion No. 28089
Heard October 12, 2021 – Filed April 6, 2022

————————

**AFFIRMED**

————————

Chief Appellate Defender Robert Michael Dudek, Kathrine Haggard Hudgins, and Adam Sinclair Ruffin, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General William Edgar Salter III, of Columbia, for Respondent.

————————

**JUSTICE FEW:** Jerome Jenkins Jr. was convicted of murder, attempted murder, and armed robbery. An Horry County jury sentenced Jenkins to death on the murder

charge.  This opinion consolidates Jenkins' direct appeal and our mandatory review of his death sentence under section 16-3-25 of the South Carolina Code (2015).  We affirm.

## I.      Facts and Procedural History

On January 2, 2015, James Daniels entered the Sunhouse convenience store at the intersection of Highway 905 and Red Bluff Road in Longs, South Carolina, on the pretense of buying a bottle of lemonade.  James' actual purpose was to scout the store for Jerome Jenkins and James' brother McKinley Daniels to rob it.  Minutes after James left the store, Jenkins and McKinley entered, masked and armed with pistols.  They first encountered Jimmy McZeke, who worked at the store.  Jenkins and McKinley fired at McZeke, but both missed.  McZeke then ran into the bathroom at the back of the store and locked the door.  Jenkins followed McZeke and shot at him through the bathroom door.  The gunshots shattered several glass bottles, and the shattered glass cut McZeke on his head.

McKinley stayed at the front of the store where the store clerk—Bala Paruchuri—stood behind the cash register.  McKinley pointed his pistol at Paruchuri, went behind the counter, and robbed Paruchuri of the money in the register.  Jenkins quickly returned to the front of the store.  As he and McKinley left the store, both shot Paruchuri.  According to the store's video security system that recorded the entire sequence, Jenkins and McKinley were in the store for thirty-seven seconds.  Paruchuri died as a result of multiple gunshot wounds.

The State charged Jenkins with murder of Paruchuri, attempted murder of McZeke, and armed robbery, and sought the death penalty for the murder charge.  During defense counsel's opening statement in the guilt phase of trial, Jenkins admitted his guilt, stating through counsel, "Let me say this to you.  I listened to the Solicitor's presentation, and a lot of what he said is true.  I will tell you this right up front, straight up: Jerome Jenkins is guilty. . . .  He's guilty of the charges that the State has brought against him."  The jury found Jenkins guilty of all three charges, and after the twenty-four-hour mandatory waiting period, the case proceeded to the sentencing phase of trial.

During the sentencing phase, the State introduced evidence that Jenkins and the Daniels brothers robbed two additional convenience stores—one Scotchman and a second Sunhouse—within hours of each other on January 25, 2015, three weeks after

the first Sunhouse robbery and murder. As in the first Sunhouse robbery and murder, James scouted each store minutes before Jenkins and McKinley entered wearing masks and armed with pistols. In the course of the robbery of the second Sunhouse store, Jenkins shot and killed the store clerk Trisha Stull.[1]

Also during the sentencing phase, the State introduced Jenkins' prior convictions for burglary in the second degree and grand larceny in 2011, and for distribution of cocaine in 2013. The State also presented a written summary of Jenkins' twenty-six disciplinary infractions in pre-trial detention in South Carolina Department of Corrections (SCDC) as evidence of Jenkins' future dangerousness. Witnesses testified to several specific instances, including Jenkins throwing "unknown liquids" on correctional officers, cutting an officer with a sharp object, assaulting an officer and threatening to kill him, throwing a metal object at an officer, throwing feces in an officer's face, and throwing a homemade knife at an officer and threatening to kill another one of the officers. The jury heard that all of this conduct occurred while the State held Jenkins as a "safekeeper" in SCDC pending trial, but the jury did not hear the reasons Jenkins was held at SCDC instead of the county jail.[2]

Jenkins called two SCDC officers to testify they had not had any disciplinary issues with Jenkins. Jenkins also presented witnesses testifying—among other things—Jenkins had three young children, was a "respectful guy," and was "vulnerable to the influence of others" because he was "very immature."[3] Dr. Donna Maddox—an

---

[1] We refer to robbery of the second Sunhouse store and the murder of Trisha Stull as "the second Sunhouse robbery and murder." The State indicted Jenkins for all of these crimes but tried only the indictments from the first Sunhouse robbery and murder.

[2] Ordinarily, a defendant who has not been given—or who has not posted—bail is held in the county jail pending trial. Section 24-3-80 of the South Carolina Code (Supp. 2021) provides a prisoner may be detained in SCDC for "safekeeping" when "commitment [is] duly authorized by the Governor, provided, a warrant in due form for the arrest of the person so committed shall be issued within forty-eight hours after such commitment and detention." A person held for safekeeping under section 24-3-80 is generally referred to as a "safekeeper."

[3] Jenkins was twenty years and eight months old at the time of the crime.

expert in forensic psychiatry—diagnosed Jenkins with several mental health disorders, including post-traumatic stress disorder, an unspecified depressive disorder, and a substance abuse disorder. Dr. Maddox also testified Jenkins was "under the influence" of McKinley or James.

The trial court charged the jury on two statutory aggravating circumstances: the defendant committed the murder while in the commission of robbery while armed with a deadly weapon and the defendant committed the murder while in the commission of larceny while armed with a deadly weapon.[4] Additionally, the trial court charged five statutory mitigating circumstances[5] to the jury.

The jury unanimously found both statutory aggravating circumstances existed and sentenced Jenkins to death for the murder of Bala Paruchuri. The trial court sentenced Jenkins to thirty years in prison for attempted murder and thirty years in prison for armed robbery but did not indicate whether the sentences were consecutive or concurrent.

## II. Analysis

Under our mandatory duty to review a sentence of death, we must "consider the punishment as well as any errors by way of appeal." § 16-3-25(B). We first address the seven errors Jenkins alleges the trial court made and then review the death sentence as required by section 16-3-25.

### A. Sentencing by Court on a Guilty Plea

The first error Jenkins alleges on appeal is the trial court denied him the right to plead guilty and be sentenced by a jury. As Jenkins acknowledges, however,

---

[4] *See* S.C. Code Ann. § 16-3-20(C)(a)(1)(e)-(f) (2015) (providing the trial court "shall include in [the trial court's] instructions to the jury for it to consider . . . Statutory aggravating circumstances: (1) The murder was committed while in the commission of the following crimes or acts: . . . (e) robbery while armed with a deadly weapon . . . [or] (f) larceny with use of a deadly weapon").

[5] *See* S.C. Code Ann. § 16-3-20(C)(b) (2015) (listing ten statutory mitigating circumstances to be considered by the jury if supported by the evidence).

subsection 16-3-20(B) of the South Carolina Code (2015) requires that when a capital defendant pleads guilty to murder, he must be sentenced by the trial court and must not be sentenced by a jury. Jenkins initially states this issue as whether the trial court "erred by refusing to declare the state's death penalty statute, S.C. Code § 16-3-20(B), unconstitutional to the extent it mandates that the sentencer is the judge and not a jury." We have repeatedly addressed this very argument, and on each occasion, we held this subsection is constitutional. *See State v. Downs*, 361 S.C. 141, 146-47, 604 S.E.2d 377, 380 (2004) (holding a defendant is not deprived of his right to a trial by jury when he pleads guilty because—as a predicate to pleading guilty—he must voluntarily waive his right to a jury trial on both guilt and sentencing; distinguishing *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)); *see also State v. Allen*, 386 S.C. 93, 102, 687 S.E.2d 21, 25 (2009) (same); *State v. Crisp*, 362 S.C. 412, 418-19, 608 S.E.2d 429, 433 (2005) (same); *State v. Wood*, 362 S.C. 135, 143, 607 S.E.2d 57, 61 (2004) (same).

Jenkins argues the Supreme Court's 2016 decision in *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), requires that a jury impose the sentence in all capital cases, effectively overruling *Allen*, *Crisp*, *Wood*, and *Downs*. In *Hurst*, the Supreme Court stated, "The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." 577 U.S. at 94, 136 S. Ct. at 619, 193 L. Ed. 2d at 508. *Hurst* is distinguishable from this case, however, for the same reason we distinguished *Ring v. Arizona* in *Allen*, *Crisp*, *Wood*, and *Downs*. *Hurst* dealt with a Florida statute under which "the jury renders an 'advisory sentence' of life or death," after which, "Notwithstanding the recommendation of a majority of the jury, the [trial] court . . . shall enter a sentence of life imprisonment or death." 577 U.S. at 95-96, 136 S. Ct. at 620, 193 L. Ed. 2d at 509 (quoting Fla. Stat. § 921.141(2)-(3) (Supp. 2012)). The Florida procedure applied even in cases in which the defendant exercised his right to a trial by jury. As we explained in *Allen*, *Crisp*, *Wood*, and *Downs*, the situation is different when the defendant makes a valid waiver of his right to a trial by jury as a predicate to pleading guilty. *See, e.g.*, *Crisp*, 362 S.C. at 418-19, 608 S.E.2d at 433 ("The constitutionality of Section 16–3–20(B) . . . rests . . . on whether the statute comports with the right to a jury trial as established by this Court and the United States Supreme Court in interpreting the state and federal constitutions."); *Downs*, 361 S.C. at 146, 604 S.E.2d at 380 ("*Ring* did not involve jury-trial waivers and is not implicated when a defendant pleads guilty."). Thus, we disagree *Hurst* has any impact on *Allen*, *Crisp*, *Wood*, or *Downs*. We once more affirm the constitutionality of the subsection 16-3-20(B)

requirement that a capital defendant who pleads guilty to murder must be sentenced by the trial court.

Jenkins' more precise and compelling argument, however, is based on a particular discussion the trial court had with him during a pre-trial hearing on March 7, 2019, nine weeks before trial.  The trial court conducted the hearing without the Solicitor present pursuant to subsection 16-3-26(B)(1) and (C)(1) of the South Carolina Code (2015).[6]  As the hearing concluded, the trial court and Jenkins joked with each other about Jenkins' move from SCDC back to the county jail in preparation for trial. Jenkins himself—not speaking through counsel—then asked the trial court whether it was legal for the State to deny him a guilty plea and make him go to trial.

> Jenkins:  I have a question.  Is it legal for them to make me go to trial?
>
> Court:  Make you go to trial?
>
> Jenkins:  Basically, they made me go to trial.  I didn't get no plea or nothing.  So, is it legal?
>
> Court:  I mean, you have the right to plead guilty if you want to plead guilty.
>
> Jenkins:  Plead guilty to the death sentence?
>
> Court:  Right.  I mean, we are both kind of smiling at each other as we say that, but I mean, there are some people who believe criminal defendants do not have a right to plead guilty.  You know, I don't think you can stop somebody from pleading guilty as charged.  But, you know --

---

[6] These subsections permit the trial court to conduct ex parte hearings for purposes of addressing the appointment of counsel and funding.  In the March 7 hearing, the trial court heard and resolved Jenkins' concerns about his counsel.

Jenkins: So if I plead guilty to the death sentence, I would be on death row?

Court: Yeah.

Jenkins: Not a chance.

Court: Right. . . .

We wish to be very clear this was error by the trial court. *See generally Crisp*, 362 S.C. at 415-16, 608 S.E.2d at 431-32 (discussing the propriety of a trial court's statements to a capital defendant concerning his right to a trial by jury); *State v. Owens*, 362 S.C. 175, 178, 607 S.E.2d 78, 79-80 (2004) (same). In *Crisp* and *Owens*, we relied on a series of four cases in which the trial court made erroneous statements to a defendant concerning his right to testify or to remain silent.[7] *Crisp*, 362 S.C. at 416-17, 608 S.E.2d at 431-32; *Owens*, 362 S.C. at 177-78, 607 S.E.2d at 79-80. The central premise of these six cases is that while discussing with a defendant a choice the defendant must make about a constitutional right, the trial court may not make an inaccurate statement of law nor inject its personal opinion into the defendant's analysis. In this case, the trial court made an inaccurate statement of law that Jenkins appears to have interpreted as the trial court's personal opinion—formed before hearing any evidence—as to whether Jenkins deserved the death penalty. This is error.

The question then becomes whether the error warrants reversal. In *Crisp* and *Owens*, we rejected the idea the error in those cases could be harmless, stating in *Crisp* "such

---

[7] *See State v. Gunter*, 286 S.C. 556, 559-60, 335 S.E.2d 542, 543 (1985) (explaining a trial court must inform the defendant of his choices accurately and stating, "A statement by the trial judge which intimates that the jury will ignore his instructions is improper"); *State v. Pierce*, 289 S.C. 430, 434, 346 S.E.2d 707, 710 (1986) (relying on *Gunter* and stating the defendant "had the right to make that decision free of any influence or coercion from the trial judge"), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991); *State v. Cooper*, 291 S.C. 332, 336-37, 353 S.E.2d 441, 443 (1986) (relying on *Gunter* and *Pierce*), *overruled on other grounds by Torrence*; *Butler v. State*, 302 S.C. 466, 467, 397 S.E.2d 87, 87 (1990) (relying on *Gunter*, *Pierce*, and *Cooper*).

comments by a trial judge during a guilty plea proceeding are fundamentally erroneous and constitute prejudicial error." 362 S.C. at 417, 608 S.E.2d at 432. In *Owens*, we recited our discussion of prejudicial error from *Pierce*, in which the Court explained, "It is virtually impossible to determine the actual effect the judge's improper statements had on Pierce." *Owens*, 362 S.C. at 178, 607 S.E.2d at 80 (quoting *Pierce*, 289 S.C. at 434, 346 S.E.2d at 710). In each of those six cases—*Crisp*, *Owens*, *Gunter*, *Pierce*, *Cooper*, and *Butler*—however, the trial court made the erroneous statements *during* the hearing at the conclusion of which the defendant made the choice whether to exercise his right to a jury trial or his right to remain silent. Thus, the prejudicial effect of the trial court's erroneous statements was known by this Court to be present in the mind of the defendant at the time he made the decision about his constitutional right.

In this case, on the other hand, the erroneous comments were made on March 7, jury qualification did not begin until May 6, and the trial itself did not start until May 10. On April 26, the trial court heard motions, including Jenkins' "Motion to Find S.C. Code 16-3-20(B) Unconstitutional and Allow Defendant to Plead Guilty & Be Sentenced by Jury of His Peers," which Jenkins previously filed in written form on April 22. In the written motion and in arguing the motion, defense counsel said nothing about what occurred at the March 7 hearing. Thus, in the April 26 motion hearing, Jenkins did not make the more precise and compelling argument he makes on appeal; he made only the argument we have repeatedly rejected in holding subsection 16-3-20(B) is constitutional. As our holdings in *Allen*, *Crisp*, *Wood*, and *Downs* required, the trial court denied the motion.

On May 10—the morning of trial and only moments before opening statements—Jenkins again brought up his motion to declare subsection 16-3-20(B) unconstitutional. His counsel stated,

> We believe that statute is unconstitutional and it takes away a defendant's right to plead guilty and be sentenced by a jury. We think every defendant is entitled to have a jury trial, that every defendant is entitled to have a jury trial on the issue of sentencing in a capital case; this being a capital case.

Jenkins still did not mention what the trial court said at the March 7 hearing, again relying only on the argument we rejected in *Allen*, *Crisp*, *Wood*, and *Downs*. The

trial court did not immediately respond.  Jenkins' counsel then explained to the trial court,

> So, what we want to do is -- because we cannot plead guilty and then have a sentencing trial by jury, what we want to do is explain to the jury in this case that we are not pleading not guilty, that we admit guilt as to the issues in this case . . . , but that the only way we could have a jury do the sentencing is to go through this process, which means the State has to present evidence and we have to wait and let the jury hear the aggravating and mitigating factors in order to make their decision.

Jenkins' counsel then asked the trial court "to inquire of Mr. Jenkins if that is his understanding and if he is on board with that, and whether or not that is okay with him.  Because, obviously, this is not something that is commonly done."  After confirming both defense counsel believed the strategy to be in Jenkins' best interest, the trial court spoke directly to Jenkins, beginning with a specific reference to the March 7 conversation,

> You and I have talked before on the record that if you did plea, then I would be the one -- we would have a sentencing trial, but there is no jury, just up to me.[8]  I think you said something like, "I like you, but not like that," or something like that.[9]  We all kind of chuckled about it . . . .

---

[8] We have not been asked to consider nor have we considered whether the trial court's comments at the May 10 hearing—particularly this statement—cured the March 7 error.  Rather, as explained below, we simply do not reach this issue because the March 7 error is not preserved.

[9] At this point in the transcript, the court reporter indicated the trial judge was "laughing."

After a lengthy dialogue, the trial court confirmed Jenkins understood the strategy. The trial court then approved the strategy, stating, "I think it is a very good strategy, and a very positive strategy."

Thus, Jenkins' trial counsel had at least three opportunities to object to the trial court's March 7 error: (1) the March 7 hearing, which—though ex parte—was attended by both defense counsel, (2) the April 26 hearing, and (3) the May 10 hearing. The trial court's playful May 10 recitation of the March 7 conversation indicates he did not realize what he told Jenkins on March 7. In fact, we see no indication in the record that the trial court was ever aware his March 7 comments could have been an issue or could have improperly influenced Jenkins' decision on his constitutional right to not plead guilty. If defense counsel had objected to the March 7 comments at any of the at least three opportunities, the trial court could have taken steps to correct its error. Or, in the unlikely event the trial court actually meant what he said, a different error would be confirmed. The first time Jenkins mentioned the March 7 error, however, was in his brief to this Court.

In addition to counsel's obligation to object to the trial court's March 7 error, the Sixth Amendment requires counsel to independently explain to a criminal defendant the law applicable to each significant issue in his case, particularly where the defendant must make an important decision about exercising a constitutional right. *See generally Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065, 80 L. Ed. 2d 674, 694 (1984) ("From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."). It is inconceivable that defense counsel did not have an extended conversation with Jenkins—probably on more than one occasion— about his right to a trial by jury, and consequently, what the law permitted and required of the trial court if Jenkins decided not to exercise his right to a trial by jury. This is particularly true in this case, where we know the question of a guilty plea was very much on the mind of Jenkins and his lawyers. In those conversations, it is equally inconceivable counsel did not explain to Jenkins that the trial court would be required by law to consider both death and life as options for his sentence, and to do so with an open mind without preconceptions as to which sentence the evidence would warrant the trial court impose.

Therefore, as to the first error Jenkins alleges on appeal, we stand by our holdings in *Allen*, *Crisp*, *Wood*, and *Downs* that the subsection 16-3-20(B) requirement that a capital defendant who pleads guilty to murder must be sentenced by the trial court is constitutional. As to Jenkins' more precise and compelling argument, we find the trial court's March 7 error is not preserved for our review because counsel never brought the error to the attention of the trial court. *See State v. Dial*, 429 S.C. 128, 132, 838 S.E.2d 501, 503 (2020) ("It is firmly established law that, ordinarily, an issue must be presented to the trial court or it is not preserved for appellate review." (citing *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003))). On this point, we find it important that the trial court's comments in *Crisp*, *Owens*, *Gunter*, *Pierce*, *Cooper*, and *Butler* not only were contemporaneous with the defendant's decision to exercise the applicable constitutional right, but also the comments were nowhere near so clearly wrong as the erroneous statement that if Jenkins pled guilty, he would, "Plead guilty to the death sentence." The trial court's playful demeanor—laughing—at the time of the March 7 comments and when the court recounted the comments on May 10 convince this Court that the trial court had no knowledge of its error. Under the circumstances present here, defense counsel was obligated to point out this error to the trial court. Had counsel done so, we are confident the trial court would have corrected its error.

Finally, because the March 7 error occurred nine weeks before trial—nine weeks before Jenkins had to actually decide whether to exercise his right to a trial by jury—we do not know whether the trial court's erroneous comments actually affected Jenkins' decision to exercise his right to a trial by jury. In *Owens* and *Pierce*, we found the erroneous comments were prejudicial with specific reliance on our finding, "It is virtually impossible to determine the actual effect the judge's improper statements had on [the defendant]." *Owens*, 362 S.C. at 178, 607 S.E.2d at 80; *Pierce*, 289 S.C. at 434, 346 S.E.2d at 710. In this case, it is quite possible "to determine the actual effect the judge's improper statements had on" Jenkins and to determine whether trial counsel's later conversations with him—or the trial court's statements during the May 10 hearing—cured Jenkins' apparent interpretation of the trial court's March 7 comments. That possibility lies in the post-conviction relief process, during which counsel's conversations with Jenkins between March 7 and May 10 can be fully explored, and Jenkins' actual understanding of both what the trial court told him and his right to have a fair and impartial trial court sentence him if he pled guilty can also be fully explored.

**B. Statement by McKinley Daniels**

The second error Jenkins alleges on appeal is the trial court's refusal to admit into evidence, during the sentencing phase, a statement made by Jenkins' co-defendant McKinley to Jenkins' expert witness Dr. Maddox. Dr. Maddox interviewed McKinley several days before Jenkins' trial. During the interview, McKinley told her that, during the course of the second Sunhouse robbery and murder, he told Jenkins to kill the store clerk—Trisha Stull. Jenkins called Dr. Maddox to testify during the sentencing phase and asked, "Do you have an opinion as to whether or not J.J. was under the influence of James or McKinley Daniels?"[10] Dr. Maddox answered, "Yes. It is my opinion he was, absolutely." In a hearing outside the jury's presence moments earlier, Jenkins told the trial court he intended to elicit from Dr. Maddox the statement by McKinley to her that McKinley "told J.J.[11] to kill Trisha Stull." The trial court refused to admit the statement, ruling it is hearsay.

The State argues the trial court was correct to find the statement is hearsay because Jenkins offered the statement in evidence to prove the truth of what McKinley asserted in his statement to Dr. Maddox—that McKinley did in fact tell Jenkins to kill Stull. *See* Rule 801(c), SCRE ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Jenkins argues, however, he did not offer the statement for that purpose, but for the purpose of explaining the basis of Dr. Maddox's opinion that Jenkins was "under the influence of . . . McKinley."[12] To

---

[10] This particular testimony was addressed to the mitigating circumstance found in subsection 16-3-20(C)(b)(5), which provides the jury must consider whether "The defendant acted under duress or under the domination of another person."

[11] Jenkins is also known by the nickname "J.J."

[12] Jenkins argues on appeal the statement was admissible under Rule 804(b)(3) of the South Carolina Rules of Evidence as a statement against interest. Jenkins did not argue admissibility under Rule 804(b)(3) to the trial court. Nevertheless, Rule 804(b)(3) applies only if the declarant is "unavailable as a witness." McKinley was present by subpoena at Jenkins' trial, had already pled guilty to murder and armed robbery, and had been sentenced to forty-five years in prison at the time of Jenkins' trial. Thus, McKinley was not "unavailable." *See Mitchell v. United States*, 526

support this argument, Jenkins relies on Rule 703 of the South Carolina Rules of Evidence.

Rule 703, SCRE, provides, "If [the facts or data . . . upon which an expert bases an opinion] [are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Rule 703, SCRE, clearly provides facts or data need not be admissible for an expert to rely on the facts or data in reaching an opinion. In this respect, Rule 703 reflects a change to the common-law rule to the contrary.[13] *See State v. King*, 158 S.C. 251, 286-87, 155 S.E. 409, 422 (1930) (applying the common-law rule that an expert must base an opinion on "his [or her] own [personal] knowledge [of] the facts" or "a hypothetical state of facts" recited in a hypothetical question), *overruled on other grounds by Brightman v. State*, 336 S.C. 348, 352, 520 S.E.2d 614, 616 (1999); *see also* Fed. R. Evid. 703 advisory committee's note to 1972 proposed rules ("In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court."). It has been less clear how Rule 703, SCRE, affects admissibility of those otherwise inadmissible facts or data when an expert has relied on the evidence in forming an opinion. As the Federal Rules Advisory Committee stated when Federal Rule 703 was amended in 2000, "Courts have reached different results on how to treat inadmissible information when it is reasonably relied upon by an expert in forming an opinion or drawing an inference." Fed. R. Evid. 703 advisory committee's note

---

U.S. 314, 326, 119 S. Ct. 1307, 1314, 143 L. Ed. 2d 424, 436 (1999) ("It is true . . . that where there can be no further incrimination, there is no basis for the assertion of the privilege. . . . If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.").

[13] The common-law rule was actually changed in South Carolina in 1990 with the addition of new Rule 24(b) to the South Carolina Rules of Criminal Procedure and Rule 43(m)(2) to the South Carolina Rules of Civil Procedure. *See* Rule 24(b), SCRCrimP (1991) (repealed 1995); Rule 43(m)(2), SCRCP (1991) (repealed 1995). *See* Rule 703, SCRE, note ("The rule is identical to the . . . former Rule 43(m)(2), SCRCP, and former Rule 24(b), SCRCrimP."); Rule 1103, SCRE ("These rules shall become effective September 3, 1995.").

to 2000 amendment. The Advisory Committee noted some federal courts and states provide unlimited admissibility of facts or data relied on by experts, while other courts allow admissibility only in limited circumstances. *Id.*

This Court and our court of appeals have made it clear that—in South Carolina—Rule 703 allows admissibility of otherwise inadmissible evidence only in limited circumstances. In other words, the mere fact an expert relies on inadmissible evidence does not make the evidence admissible. As this Court stated in *State v. Kromah*, 401 S.C. 340, 737 S.E.2d 490 (2013), Rule 703, SCRE, "does not . . . make hearsay automatically admissible simply because it was relied upon by the expert." 401 S.C. at 358, 737 S.E.2d at 499 (citing *Allegro, Inc. v. Scully*, 400 S.C. 33, 46-47, 733 S.E.2d 114, 122 (Ct. App. 2012), *remanded on other grounds*, 408 S.C. 200, 758 S.E.2d 716 (2014); *see also Jones v. Doe*, 372 S.C. 53, 62-63, 640 S.E.2d 514, 519 (Ct. App. 2006) (stating Rule 703 "does not allow for the unqualified admission of hearsay evidence merely because an expert has used it in forming an opinion"). We have yet to be so clear, however, as to how a trial court should determine whether to admit evidence reasonably relied on by an expert when the evidence is otherwise inadmissible.

We begin our analysis of whether the trial court properly excluded the evidence in this case by observing the obvious fact that evidence often serves dual purposes. Here, McKinley's statement to Dr. Maddox would be useful to the jury for the improper hearsay purpose of determining whether McKinley did in fact tell Jenkins to kill Stull during the second Sunhouse robbery and murder. McKinley's statement would also be useful for the legitimate purpose of explaining the basis for Dr. Maddox's opinion that Jenkins was "under the influence of . . . McKinley." In *State v. Perry*, 430 S.C. 24, 842 S.E.2d 654 (2020), we addressed how a trial court should analyze this situation. We stated, "To the extent a trial court finds evidence . . . does serve these dual purposes, the court must determine whether the evidence has sufficient probative force for serving the legitimate purpose that the evidence should be admitted, despite its inherent tendency to serve the improper purpose." 430 S.C. at 31, 842 S.E.2d at 657-58.

We hold the same analysis must be conducted under Rule 703, SCRE. This application of Rule 703 is consistent with the Federal Rules Advisory Committee's interpretation of the original version of Federal Rule 703, which is identical to South

Carolina's existing Rule 703.[14]  Explaining that the 2000 amendment to the Federal Rule was intended to better reflect the original meaning, the Advisory Committee stated, "Rule 703 has been amended to emphasize that when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted." Fed. R. Evid. 703 advisory committee's note to 2000 amendment.  The Advisory Committee then explained,

> When information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other.  The information may be disclosed to the jury, upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect.

*Id.*

In a lengthy hearing outside the jury's presence, the trial court conducted this very analysis on the admissibility of McKinley's statement to Dr. Maddox.  After hearing from both parties, the trial court ruled the statement is inadmissible hearsay.  We begin our review of the trial court's analysis by pointing out that Dr. Maddox's opinion did not specifically address the subsection 16-3-20(C)(b)(5) mitigating circumstance, "The defendant acted under duress or under the domination of another person."  Rather, responding to defense counsel's question "whether J.J. was under the influence of . . . McKinley," Dr. Maddox answered, "Yes."  In addition, the statement McKinley "told J.J. to kill Trisha Stull" relates directly to the second Sunhouse robbery and murder on January 25 and, thus, only indirectly to Dr.

---

[14] When South Carolina adopted the Rules of Evidence in 1995, Rule 901(a) was "identical to the federal rule." Rule 703, SCRE, note.  Rule 703, SCRE, has not been amended.

Maddox's opinion McKinley "influenced" Jenkins during the first Sunhouse robbery and murder on January 2. These facts lessen the probative value of the statement for the purpose of explaining Dr. Maddox's opinion. Jenkins makes an effective argument, however, that McKinley's statement would have served as a "factual anchor" to solidify and give credence to Dr. Maddox's opinion Jenkins was "under the influence" of McKinley. Without the statement, Jenkins argues, the jury was likely to view Dr. Maddox as a "hired gun."

Turning to the "prejudicial effect" on the State from the jury's consideration of McKinley's statement for its truth, the fact the statement relates only indirectly to the first Sunhouse robbery and murder diminishes the prejudice. In addition, the admission of the statement would have significantly helped the State in another respect because the statement directly contradicts what Jenkins told investigators in interviews admitted into evidence in the sentencing phase, that he denied participation in the second Sunhouse robbery and murder. The State placed particular emphasis on Jenkins' guilt in the Scotchman robbery and the second Sunhouse robbery and murder as justification for its seeking, and the jury's imposing, the death penalty.[15] The statement would thus have supported the State's sentencing phase argument that the death penalty is warranted against Jenkins because he committed the second Sunhouse robbery and murder. Therefore, we find the jury's use of McKinley's statement for its truth would have been only minimally prejudicial to the State.

Whether the trial court erred in excluding the statement McKinley made to Dr. Maddox is a close question. Some members of this Court would have admitted the statement, while others agree with the trial court and would have excluded it. The standard is whether the probative value of the statement for explaining Dr. Maddox's opinion "substantially outweighs" the probative value for its truth. Ultimately, we cannot say the trial court's decision to exclude the statement was an abuse of its discretion. *See State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) (stating, as to the sentencing phase of a capital trial, "The admission or exclusion of evidence

---

[15] In the Deputy Solicitor's opening statement to the jury in the sentencing phase, he emphasized the importance of Jenkins' guilt in the second Sunhouse robbery and murder to the question of whether Jenkins deserved the death penalty, stating, "The reason we are here isn't January 2, 2015. We are here for January 25, 2015; that is why we are here."

is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice").[16]

## C. Closing Argument

The third error Jenkins alleges on appeal is the trial court's refusal to allow defense counsel to tell the jury in his closing argument of the sentencing phase "that the verdict for life . . . does not have to be unanimous" or "that one vote for life would result in a life sentence." The trial court found the first statement was in "direct contradiction" to what it was going to instruct the jury and the second statement was "not necessarily true either, because if there is no unanimity as to aggravating circumstances, then the options for the Court are 30 to life."[17] The trial court also noted it was not permitted to charge the jury on the consequences of a deadlock, citing *State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (1981), *overruled on other grounds by Torrence*. Jenkins contends the trial court should have allowed counsel to make these statements and its failure to do so placed an unreasonable limitation on Jenkins' right to a meaningful closing argument. We disagree.

Subsection 16-3-20(C) outlines the procedure to be followed when the jury reaches a deadlock in a capital case after finding an aggravating circumstance, providing,

> If members of the jury after a reasonable deliberation
> cannot agree on a recommendation as to whether or not the

---

[16] Jenkins also argues the statement should have been admitted based on *Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 2151-52, 60 L. Ed. 2d 738, 741 (1979). We reject this argument. *See State v. Blackwell*, 420 S.C. 127, 160-61, 801 S.E.2d 713, 731 (2017) (discussing the "limited" applicability of *Green*); 420 S.C. at 161 n.29, 801 S.E.2d at 731 n.29 (noting the trial court's "application of our state's hearsay rules" was by no means "rote"). As did the trial court in *Blackwell*, the trial court in this case engaged in a thorough analysis.

[17] *See* § 16-3-20(A) (providing—if no aggravating circumstance is found—the sentence for murder must be a "term of imprisonment for thirty years to life"); § 16-3-20(B) (providing "if a statutory aggravating circumstance is found, the defendant must be sentenced to either death or life imprisonment").

death sentence should be imposed on a defendant found guilty of murder, the trial judge shall dismiss such jury and shall sentence the defendant to life imprisonment as provided in subsection (A).

In *Adams*, this Court considered the previous version[18] of this statute and held the consequence of a deadlock was not required to be charged to the jury. 277 S.C. at 124, 283 S.E.2d at 587. We noted a unanimous vote by the jury is the normal and required result, while an "undecided jury is the exception." *Id.* We stated, "That portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only . . . ." *Id.*

We considered again whether the jury should be told of the consequences of a deadlock in *Winkler v. State*, 418 S.C. 643, 795 S.E.2d 686 (2016). In *Winkler*, the jury specifically asked the trial court during deliberations in the sentencing phase to "explain what happens if we're not able to reach a unanimous decision." 418 S.C. at 647, 795 S.E.2d at 689. The trial court refused to answer that and a similar question, and trial counsel did not object. 418 S.C. at 647-48, 795 S.E.2d at 689. We held trial counsel was not ineffective for failing to object because there was no applicable precedent to support an objection. 418 S.C. at 653-54, 795 S.E.2d at 692. We stated, "A juror's knowledge that if the jury does not reach a verdict the court will impose a sentence of life in prison will not help the juror understand the evidence, or assist the jury in reaching a verdict." 418 S.C. at 656, 795 S.E.2d at 693. We then expressed concern "that informing the jury what the sentence will be if they do not reach a verdict creates a risk that some juror's attention may be diverted away from the duty to deliberate, and perhaps even alert a juror that he or she can control the sentence by refusing to deliberate." *Id.*

In *Adams*, we held "the legal effect" of a deadlock "is addressed to the trial judge only." 277 S.C. at 124, 283 S.E.2d at 587. In *Winkler*, we suggested instructing the jury as to the consequences of a deadlock may interfere with a jury's deliberations. 418 S.C. at 656, 795 S.E.2d at 693. Here, Jenkins argues defense counsel should be permitted to do what we suggested in *Adams* and *Winkler* the trial court should not do, inform the jury that one juror may control the outcome of the case by refusing to

---

[18] The language of the previous version does not differ in substance from the current version. *See* S.C. Code Ann. § 16-3-20(C) (Supp. 1981).

deliberate.  We disagree and now hold a party may not argue the consequences of a deadlock in its closing argument to the jury.  The risk we discussed in *Winkler* does not disappear because trial counsel, instead of the trial court, argues the law to the jury.  In a death penalty trial—in any trial—a jury verdict must be unanimous.  S.C. Const. art. V, § 22 ("All jurors in any trial court must agree to a verdict in order to render the same.").  The State has a legitimate interest in fostering the resolution of criminal trials by verdict.  If the jury does not unanimously agree, then there is no verdict.  Informing jurors an individual juror can control the outcome of the trial by holding out their vote directly frustrates the goal of a unanimous jury verdict. Therefore, we hold the trial court was correct to prohibit counsel from making the closing argument he requested.

### D.      Juror Qualification

The fourth and fifth errors Jenkins alleges on appeal are the trial court's qualification of two jurors.  Generally, there are three ways to disqualify a juror in a capital case. The first way—inapplicable here—is when the juror falls into a category requiring automatic disqualification.  The second way is based on constitutional requirements and a juror's views on capital punishment.  When a juror's "views regarding capital punishment would prevent or substantially impair the performance of his duties as a juror, then he should be excluded for cause."  *State v. Bell*, 302 S.C. 18, 25, 393 S.E.2d 364, 368 (1990) (applying *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 852, 83 L. Ed. 2d 841, 851-52 (1985)); *see also State v. Dickerson*, 395 S.C. 101, 114, 716 S.E.2d 895, 902 (2011) ("A juror must be excused from service if the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (internal quotation marks omitted) (quoting *Wainwright*, 469 U.S. at 424, 105 S. Ct. at 852, 83 L. Ed. 2d at 851-52)).  The third way is when the juror is not capable of rendering a fair verdict of guilt or innocence based on the evidence presented at trial.  *See* S.C. Code Ann. § 14-7-1020 (2017) ("The court shall . . . examine on oath any person who is called as a juror to know whether he is related to either party, has any interest in the cause, has expressed or formed any opinion, or is sensible of any bias or prejudice therein, and the party objecting to the juror may introduce any other competent evidence in support of the objection.  If it appears to the court that the juror is not indifferent in the cause, he must be placed aside as to the trial of that cause and another must be called.").

Unless a juror is statutorily disqualified under the first option, juror qualification is within the discretion of the trial court, and this Court has recognized, "Deference must be paid to the trial court who saw and heard the juror." *State v. Woods*, 382 S.C. 153, 159, 676 S.E.2d 128, 132 (2009) (applying abuse of discretion standard under option two (citing *State v. Green*, 301 S.C. 347, 354, 392 S.E.2d 157, 160 (1990))); *see also State v. Hardee*, 279 S.C. 409, 413, 308 S.E.2d 521, 524 (1983) ("Where a juror unequivocally states he is not conscious of any bias or prejudice and he can give the defendant and the state a fair and impartial trial and render a verdict according to the law and evidence, there is no abuse of discretion in the trial court's decision to qualify the juror." (citing *State v. Johnson*, 248 S.C. 153, 163-64, 149 S.E.2d 348, 353 (1966))).

### i.     Juror 350

During individual juror qualification, defense counsel asked Juror 350 if she understood "that in South Carolina that you are never required to vote for the death penalty?" Juror 350 responded, "Yes." Defense counsel then asked her if it was "a moral decision you would make after hearing any aggravating and/or mitigating circumstances after His Honor instructs you on the law?" and whether she "would make that decision on [her] own?" The juror answered "Yes" to both questions. Defense counsel then asked her, "And do you also understand you could give a life sentence for any reason or no reason just because that is what you want to do?" Juror 350 responded, "Yes, but that is not necessarily morally correct." Jenkins now argues the "not necessarily morally correct" answer indicates Juror 350 was not constitutionally qualified under *Wainwright*.

After Jenkins objected to the juror's qualification, the trial court allowed defense counsel to ask Juror 350 to explain her "not necessarily morally correct" answer. She explained, "I believe that for someone to decide whether or not the death penalty is appropriate or not should be decided on facts and evidence, not just because I want to or I don't want to. If someone were to decide for that reason, that is not morally correct." Defense counsel then asked, "So even though the Court instructed you that you could do that, you are saying that is not something you could do?" Juror 350 responded, "I mean, I could, but I wouldn't want to because of the fact I wouldn't want to be, like, that is the reason to give them a death penalty. It is more so what is presented in court." The State then asked the juror whether she would follow the trial court's instructions regarding aggravating and mitigating circumstances and that

she may choose to give mercy if she wanted, and she responded, "Yes." The trial court concluded Juror 350 was qualified, stating,

> This "morally not" statement, I took that to mean people shouldn't just base their decisions on what someone looks like or something else, you need to listen to the facts and circumstances of each case and follow the law, listen to the aggravating and mitigation that may be presented. She said she is willing and able to do that, and that she would consider all of that. And she said very clearly she could impose either sentence depending upon the facts and circumstances.

It is clear to us from the juror's answers to the follow-up questions that Juror 350 meant she would not sentence someone to *death* just because she wanted to. She stated her decision "should be decided on facts and evidence, not just because I want to or don't want to." Nothing in her responses indicates her personal opinions for or against the death penalty would have "prevented or substantially impaired" the performance of her duties as a juror. Therefore, the trial court did not abuse its discretion by qualifying Juror 350.

### ii. Juror 161

During individual juror qualification, Juror 161 stated he received an e-mail with information and photographs about this case in early 2015 because he was a detention officer at Myrtle Beach Police Department. The juror also stated he had been "reading up on the case." The juror then clarified he meant, "Right after it happened," and he had not heard or seen anything about the case since. The trial court questioned the juror and confirmed the juror would consider only the evidence presented during the trial despite his prior knowledge about the case. Jenkins objected to Juror 161's qualification, arguing, "given his employment and employer, and that he actually works at the Myrtle Beach Detention Center, that he is not qualified to serve as a juror based on employment." The trial court qualified the juror, finding the juror testified honestly, he did not know Jenkins, and he could listen to both sides.

Jenkins now argues Juror 161 should have been disqualified "not because of his employment at MBDC alone, but because of the fact that through his employment

he had viewed a BOLO and still shots of appellant." Thus, Jenkins argues the trial court should have disqualified Juror 161 under the third option of juror disqualification. We disagree. The trial court confirmed Juror 161 had not heard or read anything about the case since 2015 and ensured the juror would disregard the prior information and base his decision solely on the evidence presented in Jenkins' trial. *See Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751, 756 (1961) ("It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."); *DeLee v. Knight*, 266 S.C. 103, 111-12, 221 S.E.2d 844, 847 (1975) (affirming the trial court's finding that jurors were qualified because "Each stated he would abide by the instructions of the court and render a just verdict based solely on the evidence adduced at trial, without regard to any preconceived ideas resulting from pretrial publicity" (citing *Irvin*, 366 U.S. at 722-23, 81 S. Ct. at 1642-43, 6 L. Ed. 2d at 756)). Based on this and Juror 161's assurances to the trial court that he would decide the case based on the evidence presented at Jenkins' trial, the trial court did not abuse its discretion in qualifying the juror.

### E. Admissibility of pre-trial misconduct and Lee Correctional Institution prison riot

The sixth error Jenkins alleges on appeal is the trial court's admission of evidence in the sentencing phase of trial regarding his twenty-six pre-trial disciplinary infractions that occurred while he was held in SCDC as a "safekeeper." Jenkins contends the State never satisfied the requirements for holding Jenkins in SCDC under section 24-3-80,[19] and should not be permitted to benefit from its "unconstitutional" treatment of him. The seventh, and related, error Jenkins alleges is the trial court's exclusion of evidence regarding a prison riot in 2018 at Lee Correctional Institution in which seven inmates were killed. Jenkins sought to

---

[19] Section 24-3-80 itself does not contain any requirements for holding a prisoner in SCDC as a safekeeper. However, Executive Order Number 2000-11 section 1 states a pre-trial detainee may be transferred to SCDC in accordance with section 24-3-80, "if the individual: (1) is a high escape risk; (2) exhibits extremely violent and uncontrollable behavior; and/or (3) must be removed from the county facility to protect the individual from the general population or from other detainees." S.C. Exec. Order No. 2000-11 § 1 (Feb. 16, 2000), https://www.scstatehouse.gov/Archives/ExecutiveOrders/exor0011.htm.

introduce evidence of the riot in response to the State's evidence of his own pre-trial misconduct.

The admissibility of any evidence begins with the basic premise that "All relevant evidence is admissible . . . ." Rule 402, SCRE. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE.

As to the disciplinary infractions, the trial court admitted the evidence during the sentencing phase, stating, the "testimony is directly relevant and appropriate of the issues that are at hand in the juror's determination of whether or not the appropriate sentence is life or death." We agree the evidence is relevant. The Supreme Court has stated, "Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.'" *Skipper v. South Carolina*, 476 U.S. 1, 5, 106 S. Ct. 1669, 1671, 90 L. Ed. 2d 1, 7 (1986). The Supreme Court continued, "evidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an 'aggravating factor' for purposes of capital sentencing." *Id.* (citations omitted). It is clear to us evidence of Jenkins' misconduct—particularly towards correctional officers—as a pre-trial detainee is relevant to determine and evaluate Jenkins' future dangerousness as an aggravating circumstance in the sentencing phase of trial.

When evidence is found relevant—as it is here—the next question is whether any rule of evidence or provision of law operates to exclude the evidence. *See* Rule 402, SCRE (providing "relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina"). A defendant seeking to have relevant evidence excluded must point to some rule of evidence or other provision of law that supports the exclusion. *Hamrick v. State*, 426 S.C. 638, 651-52, 828 S.E.2d 596, 603 (2019).

Jenkins argues evidence of his pre-trial misconduct should have been excluded because it occurred while the State "unconstitutionally" held him for over three years pre-trial in maximum security prison and on death row. However, Jenkins does not point to any rule of evidence or other statutory or constitutional provision that

excludes this type of evidence.  He merely argues that it is unfair for the State to use his own conduct against him.  We disagree and find the trial court did not abuse its discretion in admitting Jenkins' pre-trial misconduct.

Turning to the Lee prison riot, Jenkins argues evidence of the riot was relevant in response to the State's introduction of his misconduct to show he acted in an unruly manner because he lived in an unruly environment at SCDC.  The trial court refused to allow the testimony, finding evidence of the riot was irrelevant.  We agree.  We have stated "the Eighth Amendment demands that a capital defendant be given wide latitude to present any relevant evidence of potentially mitigating value that might convince the jury to impose a sentence of life in prison instead of death." *Bowman v. State*, 422 S.C. 19, 36, 809 S.E.2d 232, 241 (2018).  The proffered testimony here reveals that although Jenkins was housed at Lee during the time of the riot, he was not involved in the riot in any way, even as a spectator.  Jenkins' nonparticipation in a riot has no relevance to whether he should be sentenced to life in prison or to death.

### III.    Mandatory Review of the Death Sentence

Concluding none of the errors alleged on appeal support reversal of Jenkins' death sentence, we turn to our review of the punishment itself.  Pursuant to subsection 16-3-25(C), we are required to conduct a review of Jenkins' death sentence and determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 16-3-20, and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

As to subsection 16-3-25(C)(1), Jenkins' appellate counsel argued during oral argument to this Court that the trial court's erroneous March 7 comments confirming Jenkins would be sentenced to death if he pled guilty to murder "introduced an arbitrary factor into this proceeding."  However, Jenkins elected a jury trial and was sentenced to death by a jury.  The March 7 comments were made in a pre-trial ex

parte discussion two months before the trial started. Thus, the error was completely removed from the jury's decision to impose the death sentence.

Turning to subsection 16-3-25(C)(2), we find the evidence clearly supports the jury's finding of statutory aggravating circumstances. The jury found two statutory aggravating circumstances existed: "the murder was committed while in the commission of the robbery while armed with a deadly weapon" and "the murder was committed while in the commission of a larceny with the use of a deadly weapon."[20] Jenkins admitted in the guilt phase of his trial that he was guilty of the charges against him—murder, attempted murder, and armed robbery. The evidence supports these findings.

Finally, as to subsection 16-3-25(C)(3), we hold the death penalty is neither excessive nor disproportionate to the sentences imposed in similar capital cases. We recently held that in conducting this proportionality review "subsection 16-3-25(C)(3) does not limit the pool of comparison cases to only those in which the defendant actually received a sentence of death." *Moore v. Stirling*, Op. No. 28088 (S.C. Sup. Ct. filed Apr. 6, 2022) (Howard Adv. Sh. No. 12 at 13, 27) (clarifying *State v. Copeland*, 278 S.C. 572, 591, 300 S.E.2d 63, 74 (1982)). Thus, we must consider "similar cases in which the sentence of death has been upheld," *State v. Inman*, 395 S.C. 539, 567, 720 S.E.2d 31, 46 (2011) (citing *Wise*, 359 S.C. at 28, 596 S.E.2d at 482), and other "death-eligible cases for which a record is available for our review," *Moore*, Op. No. 28088 (Howard Adv. Sh. No. 12 at 27); *see also* S.C. Code Ann. § 16-3-25(E) ("The court shall include in its decision a reference to those similar cases which it took into consideration.").

In capital cases where the State proceeded on the same aggravating circumstances and in which there were similar circumstances, we have affirmed the sentence of death. In *State v. Moore*, 357 S.C. 458, 593 S.E.2d 608 (2004), the Court upheld Moore's death sentence in connection with an armed robbery of a convenience store in which Moore killed a store clerk and shot at a witness in the store. 357 S.C. at 460-61, 465, 593 S.E.2d at 609-10, 612, *aff'd*, *Moore v. Stirling*, Op. No. 28088, (Howard Adv. Sh. No. 12 at 30) (reaffirming the holding from the direct appeal and finding, again, "Moore has not established that his capital sentence is disproportionate"). Moore entered the store without a gun, took the store clerk's gun

---

[20] *See* § 16-3-20(C)(a)(1)(e)-(f).

away from him, shot and killed the store clerk, shot at a witness with the purpose of killing him, and robbed the store before he left. 357 S.C. at 460-61, 593 S.E.2d at 609-10. Moore's crimes are less egregious than those Jenkins admitted to committing in this case because Jenkins entered each convenience store with a gun.

In *State v. McWee*, 322 S.C. 387, 472 S.E.2d 235 (1996), the Court upheld McWee's death sentence under similar circumstances. McWee and an accomplice shot and killed a store clerk in a convenience store and robbed the store before they left. 322 S.C. at 390, 472 S.E.2d at 237. During the sentencing phase, the State introduced evidence McWee and his accomplice committed another murder one week after the first. *Id.* McWee admitted shooting the victim in the first robbery and denied killing the victim in the second robbery, *id.*, just as Jenkins did at his trial.

Jenkins admitted he entered the first Sunhouse convenience store, shot and killed Paruchuri, shot at McZeke, and robbed the store before he left. The jury found him guilty of murder, attempted murder, and armed robbery. Jenkins' crimes are highly similar to the murder we reviewed in *McWee* and more egregious than the murder we reviewed in *Moore*. Jenkins' admission to those crimes coupled with the aggravating circumstances of Jenkins' future dangerousness and the evidence that Jenkins committed two more armed robberies and a murder just weeks later leads us to conclude the death sentence was neither excessive nor disproportionate.

## IV. Conclusion

We affirm Jenkins' conviction and death sentence.

**AFFIRMED.**

**BEATTY, C.J., KITTREDGE, HEARN and JAMES, JJ., concur.**